**Marjorie BOOTON, Plaintiff–Appellant,**

v.

**LOCKHEED MEDICAL BENEFIT PLAN, Defendant–Appellee.**

No. 95–56381.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 1997.

Decided April 11, 1997.

Charles J. Fleishman, Beverly Hills, California, for plaintiff-appellant.

Robert C. Juman, Quinn, Emanuel, Urquhart & Oliver, Los Angeles, California, for defendant-appellee.

Before: FARRIS, KOZINSKI and T.G. NELSON, Circuit Judges.

## OPINION

KOZINSKI, Circuit Judge.

Marjorie Booton's first misfortune was being kicked in the teeth by a horse. Her second was being rebuffed by a medical insurer that seemed not to understand—or want to understand—the nature of her first misfortune.

### I

At the time Booton was injured, she was covered by a medical insurance policy that excluded ordinary dental work, but did cover work "required on account of accidental injury to natural teeth." Lockheed Medical Benefit Plan, Article II, § A(5)a(1).[1]

Booton's injury left four of her front teeth "hanging from her gums."[2] Booton's dentists labored to reset those teeth, a process which required that the teeth be splinted to her rear teeth for support. First, however, Booton's rear teeth had to be prepared—through a variety of expensive procedures—to support the splint. None of these procedures, her dentists attested, had anything to do with any condition that "she may or may not have had before ... the accident." Declaration of Dr. Barry M. Vilkin at 3; Declaration of Dr. Philip Mendelovitz at 2–3.

Booton filed a claim for the work done on her teeth. Aetna, which administers the plan for Lockheed, denied payment for work on the back teeth.[3] Its reason? The back teeth had not been injured. But, as Booton succinctly stated: "The question is not whether the teeth were injured but rather whether or not the work on the teeth was needed because of injury to natural teeth." Appellant's Reply Br. at 1.

In response to Aetna's denial, Booton tried to explain the connection between the injury and the work performed on her back teeth; Aetna denied the claim because the back teeth were not injured. Booton explained again; again Aetna denied the claim because the back teeth were not injured. Booton opened envelopes hoping to receive a check, but had to console herself with heartfelt letters from Aetna's computers.[4] One printout informed her that calcium hydroxide therapy—a procedure performed by her dentists to keep her body from rejecting her reset front teeth—was not covered by the plan. Letter from Aetna to Dr. Barry M. Vilkin, Oct. 7, 1992, at 1 ("[T]his type of procedure is specifically excluded under the plan."). This was simply untrue. If the procedure was necessitated by "accidental injury," it was, under the terms of the plan, covered. Although Dr. Vilkin, Booton's dentist, had explained in a letter to Aetna how the calcium hydroxide treatment was related to the accident, Aetna's epistles ignored this explanation.

At one point, Dr. Bill Herod, Aetna's consulting dentist, made an internal note that pre-accident X-rays might support Booton's position but, Aetna concedes, no one ever requested these X-rays. Dr. Herod also made notes regarding records he would request "[i]f questioned." See "Interoffice Communication," March 17, 1994, at 1 ("If questioned, obtain rationale from providers that these services are *indeed* the result of an accident."). But instead of requesting these records, Aetna sent out a stream of cookie-cutter denial letters.[5]

---

1. Because the plan is covered by ERISA, 29 U.S.C. §§ 1001 *et seq.*, its decisions are reviewable in federal court.

2. For readers with a dictionary handy, the teeth in question "were severely luxated, intruded or partially avulsed." Letter from Dr. Barry M. Vilkin to Aetna, Sept. 17, 1992, at 1.

3. "In total, Mrs. Booton had submitted claims for $18,265, and Aetna determined that $7,860 was allowable." Declaration of Jill Nelson [Aetna] at 6.

4. *See, e.g.*, Aetna Replacement Explanation [sic] of Benefits [sic], Dec. 12, 1994, at 2. This letter (a duplicate of a Sept. 1, 1992 communication)

denied Booton coverage and referred her to a remark, which states *in full:* "These services are not covered under your Lockheed Medical Benefits Plan."

5. *See* Letter from Aetna Claim Department to Harley Booton, July 8, 1992, at 1 ("The attached claim is being returned to you. Please be advised that we insure the claimant for medical expenses only. Therefore, please submit the claim to the Dental Carrier."); Letter from Aetna Claim Department to Harley Booton, Oct. 21, 1992, at 1 ("The attached claim is being returned to you. Please be advised that we insure the claimant for medical expenses only. Therefore, please submit the claim to the Dental Carrier."); Letter from Aetna Claim Department to Harley

Eventually, Booton hired a lawyer to help her scale the stonewall. The lawyer wrote to Aetna, explaining very clearly the basis for Booton's claim. Letter from Patrick J. Delchop to Aetna, January 6, 1994, at 3. This time Aetna came back with a two-page letter—apparently written by an actual human being—less than one sentence of which purported to explain why Booton's claim for treatment of her back teeth was being rejected: "[I]t has been determined ... that some of the dental work claimed ... was not the result of an accidental injury." Letter from John M. Rust to Harley Booton, April 1, 1994, at 2.

Booton filed suit. Lockheed moved for summary judgment and Booton cross-moved. Judge Gadbois granted Lockheed's motion and denied Booton's. She appeals.

## II

■ ERISA plan administrators do not have unbounded discretion. Under federal law, an ERISA plan "shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant: (1) The specific reason or reasons for the denial; (2) Specific reference to pertinent plan provisions on which the denial is based; (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review." 29 C.F.R. § 2560.503–1(f). In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is

nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters.

■ Aetna's conduct in handling Booton's claim did not comply with this common sense standard; not close. Aetna's rejection letters—quoted "at length" above—denied benefits without a rational explanation, without even acknowledging Booton's argument that her back teeth needed work on account of the injury to her front teeth. Worse, Dr. Herod advised Aetna that more information (such as pre-accident X-rays) might help Booton substantiate her claim, but the plan administrator failed to ask for it. Dr. Herod also asserted that "[n]one of the[ ] documents [forwarded by Booton's dentists] explains why Mrs. Booton's accident required treatment to her back teeth." Herod Supplemental Declaration at 1. The record shows that plaintiff's dentists were ready and able to explain their work but no one at Aetna sought their explanations.

Lacking necessary—and easily obtainable—information, Aetna made its decision blindfolded. Even after this case was filed, Dr. Herod explained his reasoning this way:

> As a result of my review, I determined that services performed on some of Mrs. Booton's teeth ... were not accident related. *This determination was based largely on two observations: first, the Operative Report of [Booton's dentist] did not mention any injury to any of Mrs. Booton's back teeth and second, my review of Mrs. Booton's X-rays indicated that she had suffered no damage to these back teeth during the accident.* As a result of this finding, I determined that services performed on these teeth were not covered because they were not accident related.

Herod Declaration at 1–2 (emphasis added). As this passage makes clear, Dr. Herod never came to terms with Booton's argument that her non-injured back teeth required injury-related work, a concept so straightforward that anyone with good will and a modicum of intelligence would have been bound to grasp it.[6]

Booton, May 13, 1993, at 1 ("The attached claim is being returned to you. Please be advised that we insure the claimant for medical expenses only. Therefore, please submit the claim to the Dental Carrier.").

6. Although we do not find that Aetna's actions were malicious, we are concerned that it had little incentive to come to grips with Booton's claims. *See Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1560–61, 1569 (11th Cir.1990)

Had Aetna requested the needed information and offered a rational reason for its denial, it would be entitled to substantial deference. But to deny the claim without explanation and without obtaining relevant information is an abuse of discretion. *See Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 538 (9th Cir.1990) (burden is on plan to obtain adequate information to make decision); *cf. Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 691 (7th Cir.1992) (an ERISA plan cannot rely on a lack of information to support its denial of benefits when it fails to inform the beneficiary about the missing information so that the beneficiary can provide it).[7] Lockheed, therefore, was not entitled to summary judgment in its favor.

### III

■ We now turn to that part of the district court's order that denied Booton's cross-motion for summary judgment.

In support of her motion, Booton presented credible evidence that all the services she received were, indeed, accident-related. For example, Dr. Mendelovitz explained:

After the [four injured] teeth were repositioned ... they had to be supported. You can call it anchoring or bracing.... [N]ewly planted trees are often staked until they can take root. Otherwise, they have a tendency to fall over. The same was true with the four front upper teeth. They needed support to keep them in place until they could reestablish themselves in Mrs. Booton's mouth. The only way to do this was to "splint" them. I was in charge of splinting the teeth. Splinting required that the front teeth be attached to the rear teeth for support. All of the upper teeth were thus capped and the caps were connected so that there was a single bridge that connects all of the upper teeth.... The proper dental term used is "full maxil-

lary arch splint." The arch had to be "provisional," that is to say capable of being removed and replaced, for at least a year because we did not know if one or more of the front upper teeth would be lost or if root canals would be necessary on one or more of the back upper teeth....

Mrs. Booton had permanent "caps" on her rear upper teeth when I first saw her. These "caps" had to be removed and the teeth prepared for the maxillary arch provisional splinting. This is because the "caps" that were in place were not connected to each other as they need to be when there is a splinting of the teeth. Further, because of the provisional nature of the arch (it had to be durable, removable and replaceable) food could accumulate under the bridge thereby causing decay of the teeth. To protect the teeth under the provisional splinting, gold copings covering the natural [teeth] were required.

Mendelovitz Declaration at 1–2. And Dr. Vilkin stated:

In order to prepare teeth for the arch splinting, it is necessary to prepare them to be capped. This required Dr. Mendelovitz to shave them down. Sometimes the preparation of a tooth for capping may also require a root canal. In this case, preparation of some of the upper teeth, uninjured in the accident, for the arch splinting required that they have root canal work also. That is why I had to do root canals on [Booton's rear teeth]. If an earthquake destroys one wall of a building so that three walls remain standing, rebuilding of the destroyed wall requires nailing it to the standing walls. The work done on the standing walls is not done because there is anything wrong with them. The work is done so that the destroyed wall can stand again. Thus it was that work was done by

(warning of conflict of interest when plans must investigate claims).

**7.** In the recent case of *Birdsell v. United Parcel Serv.,* 94 F.3d 1130 (8th Cir.1996), brought to our attention by Lockheed, the court approved a denial of dental benefits only after "Birdsell's oral surgeon acknowledged that he provided Aet-

na with all of the requested information to determine whether the [treatments] were medically necessary", *id.* at 1133; that is not what happened here. Aetna failed to request additional information and therefore couldn't make the type of rational decision to which the court must defer.

me on teeth that were not directly affected by the horse kick.

Vilkin Declaration at 3.

Lockheed could have preserved a dispute by presenting counter-affidavits, but did not. In its "Statement of Genuine Issues" Lockheed lists the following key item: "Not all of the dental services of Drs. Vilkin and Mendelovitz were necessary as a result of the plaintiff's accident of February 1992." *Id.* at 2. In support of this contention it cites only paragraph 4 of Dr. Herod's declaration of June 2, 1995, which states that repairs to Booton's back teeth were not covered because—who would have guessed?—"she had suffered no damage to these back teeth during the accident." Herod Declaration at 2.

Lockheed now claims "Dr. Herod disagreed" that the work done on her back teeth was preparatory for the installation of the splint. Appellee's Br. at 17. In fact, nothing in the record suggests that Dr. Herod disagreed—or even that he thought about the question. We therefore remand with instruction that the district court enter summary judgment on liability—that is to say, that the work of Drs. Vilkin and Mendelovitz was accident-related—in favor of Booton. We also remand for calculation of damages.[8]

### IV

■ "What we got here," said Strother Martin, "is a failure to communicate."[9] This is an all-too-common occurrence when ERISA-covered health benefit plans deny claims. While a health plan administrator may—indeed must—deny benefits that are not covered by the plan, it must couch its rulings in terms that are responsive and intelligible to the ordinary reader. *See* 29 C.F.R. § 2560.503–1(f). If the plan is unable to make a rational decision on the basis of the materials submitted by the claimant, it must explain what else it needs. *Id.* If ERISA plan administrators want to enjoy the deference to which they are statutorily entitled, they must comply with these simple, common-sense requirements embodied in the

regulations and our caselaw. The plan here did not.

### REVERSED and REMANDED.

---

8. Aetna claims some of the charges submitted by Booton were unreasonable. Because it bases this decision on proprietary information, Booton was precluded from disputing it below. The question can be taken up on remand.

9. *Cool Hand Luke* (Warner Bros.1967).