**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GRACIELA SAFFON,
        *Plaintiff-Appellant,*

    v.

WELLS FARGO & COMPANY LONG
TERM DISABILITY PLAN, an ERISA
plan,

        *Defendant-Appellee.*

No. 05-56824

D.C. No.
CV-04-01237-GPS

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
George P. Schiavelli, District Judge, Presiding

Argued and Submitted
August 10, 2007—Pasadena, California

Filed January 9, 2008
Amended April 16, 2008

Before: Alex Kozinski, Chief Judge, Johnnie B. Rawlinson,
Circuit Judge and Miriam Goldman Cedarbaum,*
Senior District Judge.

Opinion by Chief Judge Kozinski

---

*The Honorable Miriam Goldman Cedarbaum, Senior District Judge for the Southern District of New York, sitting by designation.

**COUNSEL**

Cassie Springer-Sullivan and Charles J. Fleishman, Beverly Hills, California, for the plaintiff-appellant.

Yuliya I. LaRoe and Eric R. McDonough, Seyfarth Shaw LLP, Los Angeles, California, for the defendant-appellee.

**ORDER**

The opinion filed January 9, 2008, appearing at 511 F.3d 1206 (9th Cir. 2008), is ordered amended as follows:

Page 1215, Column 2,
Line 38     After <disabled under the terms of the Plan. > insert a footnote stating: <In its petition for rehearing, Wells Fargo claims that our precedents forbid the district court from hearing additional evidence. *E.g.*, *McKenzie* v. *General Telephone Co. of Cal.*, 41 F.3d 1310, 1316 (9th Cir. 1994) (error for district court to hear additional evidence of disability not presented to plan administrator); *Taft* v. *Equitable Life Assur. Soc'y*, 9 F.3d 1469, 1472 (9th Cir.

1993) (same). But *Abatie* held that district courts may take additional evidence whenever "[procedural] irregularities have prevented full development of the administrative record," *Abatie*, 458 F.3d at 973, and to the extent that our earlier cases conflict with *Abatie*, a later en banc decision, those cases are no longer good law. Here, MetLife failed to have a meaningful dialogue with Saffon, and that procedural irregularity prevented full development of the administrative record because it prevented Saffon from obtaining the Functional Capacity Evaluation that MetLife now claims to need. Therefore, the district court may take additional evidence. *Id.*>

Page 1217, Column 1,
Line 6    After <evidence MetLife may present. > insert a footnote stating: <Wells Fargo's petition for rehearing claims that only plan administrators have authority to determine whether Saffon is disabled; the district court may not do so. *See, e.g.*, *Saffle* v. *Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir. 1996) (remanding to plan administrator, rather than district court, to determine whether claimant was disabled); *Patterson* v. *Hughes Aircraft Co.*, 11 F.3d 948, 951 (9th Cir. 1993) (same). But we have held that, where procedural irregularities have prevented full development of the administrative record, the district court may hear additional evidence. *See Abatie*, 458 F.3d at 973. There would be no point in taking additional evidence in the district court if the court were not authorized to decide the issue. *See id.* at 974 (remanding to the district court rather than the plan administrator).>

The petition for rehearing and rehearing en banc is denied. *See* Fed. R. App. P. 35; Fed. R. App. P. 40. No further petitions may be filed.

## OPINION

KOZINSKI, Chief Judge:

We consider whether an ERISA plan administrator properly terminated benefits because of its beneficiary's failure to produce evidence of her disability.

## Facts

Graciela Saffon has long suffered from degeneration of her cervical spine, a condition confirmed by repeated MRI scans and X-rays. After a car crash aggravated her condition in December 2001, Saffon quit her desk job at Wells Fargo Bank and applied for disability benefits from defendant, the Wells Fargo & Co. Long Term Disability Plan. The Metropolitan Life Insurance Company (MetLife), which served both as the Plan's insurer and as its claims administrator, promptly began to pay her short-term disability benefits. Saffon eventually applied for long-term disability benefits, which MetLife granted. After paying long-term benefits for a year, MetLife informed Saffon that she "no longer m[et] the definition of disability" and terminated her long-term benefits. Saffon then unsuccessfully availed herself of MetLife's administrative appeals process.

Saffon sued the Plan under 29 U.S.C. § 1132(a), seeking payment of withheld benefits, attorney's fees and a declaration that she is disabled. After a bench trial on the administrative record, the district court concluded that the Plan hadn't abused its discretion and denied Saffon any relief.

## Standard of Review

[1] 1. We review benefits denials de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits;" if the plan does grant such discretionary authority, we review the administra-

tor's decision for abuse of discretion. *Firestone Tire & Rubber Co.* v. *Bruch*, 489 U.S. 101, 115 (1989).

Here, the Plan's Summary Plan Description states:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.

Saffon argues that we must review MetLife's decision de novo because it is unclear whether the Summary Plan Description's discretionary clause refers to MetLife. *Kearney* v. *Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999) (en banc) (we defer only if the grant of discretionary authority is "unambiguous[ ]"). Saffon sees an ambiguity in the fact that the Summary Plan Description doesn't refer to MetLife by name; instead, it grants discretionary authority to "the Plan administrator [Wells Fargo] and other Plan fiduciaries." But it's perfectly clear that MetLife is included in this grant of discretionary authority because it is one of the "other Plan fiduciaries" mentioned there.

**[2]** A "fiduciary" is an entity with "any discretionary authority" in the "administration of" an ERISA plan. 29 U.S.C. § 1002(21)(A). *See Aetna Health Inc.* v. *Davila*, 542 U.S. 200, 220 (2004) ("When administering employee benefit plans, HMOs must make discretionary decisions regarding eligibility for plan benefits, and, in this regard, must be treated as plan fiduciaries."). MetLife's Certificate of Insurance provides that "MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract." The Summary Plan Description explains that the Plan "is . . . administered by [MetLife]." "To qualify for LTD benefits," beneficiaries must "[r]eceive approval for LTD benefits by MetLife." Those "benefits will begin" one month

after "MetLife determines you are disabled," and will end on "[t]he date MetLife determines that you are no longer disabled."

[3] These provisions leave no doubt that MetLife is an entity with discretionary authority to administer the Plan. MetLife is therefore one of the "other Plan fiduciaries" to which the Summary Plan Description grants "discretionary authority to . . . determine eligibility for . . . Plan benefits." While the path to this conclusion is somewhat tortuous, it is also perfectly clear. *See Wilson Arlington Co.* v. *Prudential Ins. Co. of Am.*, 912 F.2d 366, 371 (9th Cir. 1990) (complexity is not the same thing as ambiguity). The Plan unambiguously confers discretionary authority on MetLife to administer benefits claims.

[4] **2.**    Saffon also argues that we must disregard the discretionary authority granted to MetLife because the California Insurance Commissioner has revoked the Certificate of Insurance in Saffon's policy, and "any related Summary Plan Descriptions."[1] At least 6 other states have done the same; the National Association of Insurance Commissioners encourages the remaining 43 to follow suit. *See* Henry Quillen, State Prohibition of Discretionary Clauses in ERISA-Covered Benefit Plans, J. Pension Planning & Compliance, Summer 2006, at 67.

This nationwide vote of no confidence seems to have been precipitated by the cupidity of one particular insurer, Unum-Provident Corp., which boosted its profits by repeatedly denying benefits claims it knew to be valid. UnumProvident's

---

[1]Order from John Garamendi, Cal. Ins. Comm'r, to All Disability Insurers Doing Business in California 2 (Feb. 27, 2004). MetLife chose not to request a hearing on this decision; the Commissioner's withdrawal therefore became effective 91 days after his Order was published. Cal. Ins. Code § 10291.5(f). As a result, MetLife may no longer "issue[ ] or deliver[ ]" an insurance policy like Saffon's in California. *Id.* § 10290.

internal memos revealed that the company's senior officers relied on ERISA's deferential standard of review to avoid detection and liability. *See* John H. Langbein, Trust Law As Regulatory Law: The UNUM/Provident Scandal and Judicial Review of Benefit Denials Under ERISA, 101 Nw. U. L. Rev. 1315, 1317-21 (2007) (describing UnumProvident's behavior). It is an open question whether the states' efforts are preempted by ERISA, 29 U.S.C. § 1144(a), or (as is more likely) they are saved from preemption because they "regulate[ ] insurance," *id.* § 1144(b)(2)(A). *See* Quillen, *supra*, at 77-79 (arguing against preemption). The parties haven't briefed the preemption question in depth, and we do not consider it.

**[5]** Even if federal law permitted states to nullify an ERISA plan's grant of discretionary authority, California law doesn't authorize the Commissioner to do so retroactively. Cal. Ins. Code § 10291.5(f). Assuming that the Commissioner may prohibit insurance companies from using this discretionary clause in future insurance contracts, he cannot rewrite existing contracts so as to change the rights and duties thereunder. *Cf. Peterson* v. *Am. Life & Health Ins. Co.*, 48 F.3d 404, 410 (9th Cir. 1995) ("[A]n otherwise valid [insurance] policy is a binding contract and governs the obligations of the parties until the Commissioner revokes his approval.").

**[6] 3.** That the Plan grants MetLife discretionary authority is only the first step in determining the standard by which we review its denial of benefits. While we nominally review for abuse of discretion, the degree of deference we accord to a claims administrator's decision can vary significantly. In *Bruch*, the Supreme Court instructed us to "weigh[ ]" a fiduciary's "conflict of interest" as "a 'facto[r] in determining whether there is an abuse of discretion.' " 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)). MetLife labors under such a conflict of interest: It both decides who gets benefits and pays for them, so it has a direct financial incentive to deny claims. *See* Langbein, *supra*, at 1321 ("The danger pervades the ERISA-plan world that a

self-interested plan decisionmaker will take advantage of its license under *Bruch* to line its own pockets by denying meritorious claims.").

**[7]** The district court didn't take MetLife's conflict of interest into account, apparently because Saffon didn't produce "material, probative evidence" of the conflict. *Atwood* v. *Newmont Gold Co.*, 45 F.3d 1317, 1323 (9th Cir. 1995). *Atwood* was the law in our circuit at the time the district court reached its decision but it has since been overruled. *Abatie* v. *Alta Health & Life Ins. Co.*, 458 F.3d 955, 966-67 (9th Cir. 2006) (en banc). In *Abatie*, we explained that a reviewing court must always consider the "inherent conflict that exists when a plan administrator both administers the plan and funds it." *Id.* at 967. We "weigh" such a conflict more or less "heavily" depending on what other evidence is available. *Id.* at 968. We "view[ ]" the conflict with a "low" "level of skepticism" if there's no evidence "of malice, of self-dealing, or of a parsimonious claims-granting history." *Id.* But we may "weigh" the conflict "more heavily" if there's evidence that the administrator has given "inconsistent reasons for denial," has failed "adequately to investigate a claim or ask the plaintiff for necessary evidence," or has "repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly." *Id.*

In explaining what it means to "weigh" a conflict of interest, *Abatie* "conscious[ly]" rejected the "sliding scale" approach adopted by other circuits:

> [W]eighing a conflict of interest as a factor in abuse of discretion review requires a case-by-case balance . . . . A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage. An egregious conflict may weigh more heavily (that is, may cause

the court to find an abuse of discretion more readily) than a minor, technical conflict might.

*Id.* at 967, 968. *Abatie* went on to offer additional guidance:

[C]ourts are familiar with the process of weighing a conflict of interest. For example, in a bench trial the court must decide how much weight to give to a witness' testimony in the face of some evidence of bias. What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records. We believe that district courts are well equipped to consider the particulars of a conflict of interest, along with all the other facts and circumstances, to determine whether an abuse of discretion has occurred.

*Id.* at 969.

As we read *Abatie*, when reviewing a discretionary denial of benefits by a plan administrator who is subject to a conflict of interest, we must determine the extent to which the conflict influenced the administrator's decision and discount to that extent the deference we accord the administrator's decision. In so doing, we seek to overcome the "serious . . . danger of conflicted plan decisionmaking" illustrated by the Unum-Provident scandal. Langbein, *supra*, at 1335.

[8] Because the district court did not have the benefit of *Abatie*'s teachings, it applied the wrong legal standard in reviewing MetLife's determination that Saffon is not disabled. We therefore accord the district court's ruling no deference and examine the record afresh through *Abatie*'s lens.

**Merits**

**1.** After MetLife granted Saffon long-term disability benefits, it commissioned Dr. John D. Thomas to review her medical records. Dr. Thomas found that Saffon hadn't provided evidence to corroborate her claim that the pain prevented her from working: "[Saffon's] file," he wrote, "lacks detailed, objective, functional findings or testing which would completely preclude [an effort by Saffon to return to work]." MetLife forwarded Dr. Thomas's report to Dr. Kudrow, Saffon's neurologist. Dr. Kudrow responded to Dr. Thomas's report in a detailed letter that discussed Saffon's reported symptoms, his unsuccessful attempts to alleviate them and the evidence of Saffon's condition: "Objective evidence of cervical pathology is noted in previous cervical spine MRI which shows multilevel degenerative disease." Saffon herself also wrote explaining that her condition "has not changed, it has been the same for over a year now, my headaches and neck pain are moderately severe 24 hours a day."

MetLife added Saffon's and Dr. Kudrow's letters to Saffon's file and sent it back to Dr. Thomas for a second review, whereupon Dr. Thomas again concluded that Saffon's file "lacks clear, sequential, detailed, objective clinical information which would completely preclude Ms. Saffon from an attempt at return to work." MetLife faxed this pronouncement to Dr. Kudrow and gave him a deadline: "If you disagree with the findings of [Dr. Thomas's second] review, please respond by fax [within ten days] with supporting documentation. If we do not hear from you, we will presume you are in agreement with the findings of the review." MetLife did not send Saffon a copy of this query. Dr. Kudrow did not reply before the expiration of MetLife's ten-day deadline, nor, of course, did Saffon.

MetLife then terminated Saffon's benefits, explaining its decision as follows:

> The medical information provided no longer pro-
> vides evidence of disability that would prevent you
> from performing your job or occupation. You no
> longer meet the definition of disability therefore
> your claim has been withdrawn . . . .

The letter advised Saffon that she could appeal the decision
by providing

> medical evidence from the doctor(s) treating you for
> a condition that indicates you are under the appropri-
> ate care and treatment and objective medical infor-
> mation to support your inability to perform the duties
> of your occupation.

Saffon appealed and, in an apparent effort to provide "ob-
jective medical information," she included her most recent
MRI, which showed that her cervical spine was "not signifi-
cantly changed" since the MRI taken right after the car crash.
She also included another letter from Dr. Kudrow, her treating
neurologist, who confirmed that Saffon had tried a variety of
pain treatments "without sustainable benefit" and that she was
still "unable to tolerate sustained sitting."

MetLife referred Saffon's appeal to Dr. Robert A. Menotti,
who, like Dr. Thomas, neither examined nor interviewed her.
After reading MetLife's file, Dr. Menotti concluded that
"[t]here simply is not enough objective medical findings and
office notes that have continued to flow into this file, that con-
vince this reviewer that the claimant's self-reported headache
and chronic pain syndrome has been enough to preclude her
from" working.

MetLife thereupon denied Saffon's appeal:

> Medical information furnished reflects diagnoses
> including chronic headaches, chronic pain syndrome,
> cervical spondylosis, cervical strain and sprain. The

determination of disability is not based on the presence of diagnoses, but is based on functional ability supported by clinical evidence that would substantiate symptoms consistent with those reported by the patient and medical providers. In this determination of disability, we must take into consideration current restrictions and limitations that are supported by clinical evidence that substantiates an inability to perform the duties of your job for your own or any employer in accordance with the Wells Fargo Disability Plan.

. . . It is not clear what Dr. Kudrow used as a basis for [his diagnosis of your] reported limitations as we've not been furnished with a Functional Capacity Evaluation that would objectively measure and document your current level of functional ability.

. . . The MRI of April 28, 2003 documents degenerative changes [in your cervical spine], but indicates this is unchanged from the prior January 12, 2002 MRI. No progression in degeneration is documented. Prescribed medications of bextra and celexa do not appear to represent an excessive amount of medication that would result in decreased concentration levels. The frequency of pain clinic visits were noted to not be excessive to the degree that would render you unable to perform sedentary functions consistent with your own occupation.

**[9] 2.** Ten years ago, in *Booton* v. *Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997), we interpreted the ERISA regulations as calling for a "meaningful dialogue" between claims administrator and beneficiary. In resolving Saffon's claim for benefits, MetLife was required to give her "[a] description of any additional material or information" that was "necessary" for her to "perfect the claim," and to do

so "in a manner calculated to be understood by the claimant." 29 C.F.R. § 2560.503-1(g).

**[10]** MetLife cannot be faulted for taking our instructions in *Booton* too seriously. Its communications with Saffon and her doctors are hardly a model of clarity; they certainly do not explain "in a manner calculated to be understood by the claimant" what Saffon must do to perfect her claim. For example, Dr. Thomas's statement that Saffon's file "lacks clear, sequential, detailed, objective clinical information which would completely preclude Ms. Saffon from an attempt at return to work" is little more than a long series of unconnected adjectives. How an absence of information could preclude Saffon from returning to work, what function the word "sequential" plays in this litany, or why Dr. Kudrow's report and attached MRI did not amount to "objective clinical information" or was not "clear" is left to the imagination.

**[11]** MetLife's termination letter to Saffon is equally uninformative. It notes merely that "[t]he medical information provided no longer provides evidence of disability that would prevent you from performing your job or occupation," but does not explain why that is the case, and certainly does not engage Dr. Kudrow's contrary assertion. The termination letter does suggest Saffon can appeal by providing "objective medical information to support [her] inability to perform the duties of [her] occupation," but does not explain why the information Saffon has already provided is insufficient for that purpose.

Both Saffon and Dr. Kudrow then provided additional information about Saffon's course of treatment, including evidence that Saffon's pain was not relieved by a variety of pain treatments. This proved unsatisfactory to Dr. Menotti (who reviewed Saffon's administrative appeal); he remained unconvinced "that the claimant's self-reported headache and chronic pain syndrome has been enough to preclude her from" working. Dr. Menotti does not explain why he is uncon-

vinced, nor what Saffon or Dr. Kudrow would need to do to convince him. MetLife nevertheless relied on Dr. Menotti's evaluation to deny Saffon's appeal in the three paragraphs quoted above at page 280-81. The first of these paragraphs is no more intelligible than MetLife's original denial letter, perhaps less so. It's even unclear whether this paragraph purports to give reasons for the denial or merely explains the standard of review that MetLife is applying. In any event, we can make out nothing in it of use to the claimant.

The second paragraph does communicate some useful information. In responding to Dr. Kudrow's various reports, MetLife notes that "[i]t is not clear what Dr. Kudrow used as a basis for [his diagnosis] . . . as we've not been furnished with a Functional Capacity Evaluation that would objectively measure and document your current level of functional ability." This appears to be not only MetLife's first (and only) response to Dr. Kudrow's evaluation, but also the first reference in the record to the absence of a Functional Capacity Evaluation—at least, the parties have pointed us to no other reference, and we've not located one on our own. Since this was MetLife's final denial of Saffon's claim, this information came too late to do Saffon any good.

The third paragraph contains the following self-contradictory passage:

> The MRI of April 28, 2003 documents degenerative changes [in your cervical spine], but indicates this is unchanged from the prior January 12, 2002 MRI. No progression in degeneration is documented.

We do not understand how the April 28, 2003, MRI can document "degenerative changes" but remain "unchanged" from the January 12, 2002, MRI. In any event, assuming that the MRIs document no "progression in degeneration," MetLife does not explain why further degeneration is necessary to sustain a finding that Saffon is disabled. After all, MetLife had

been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled. In order to find her no longer disabled, one would expect the MRIs to show an *improvement*, not a lack of degeneration.

**[12]** Insofar as MetLife believed that a Functional Capacity Evaluation, or some other means of objectively testing Saffon's ability to perform her job, was necessary for it to evaluate Saffon's claim, it was required to say so at a time when Saffon had a fair chance to present evidence on this point. We addressed this issue directly in *Abatie*:

> An administrator must provide a plan participant with adequate notice of the reasons for denial, 29 U.S.C. § 1133(1), and must provide a "full and fair review" of the participant's claim, *id.* § 1133(2); *see also* 29 C.F.R. § 2560.503-1(g)(1), (h)(2). When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures. Section 1133 requires an administrator to provide review of the specific ground for an adverse benefits decision. By requiring that an administrator notify a claimant of the reasons for the administrator's decisions, the statute suggests that the specific reasons provided must be reviewed at the administrative level. Moreover, a review of the reasons provided by the administrator allows for a full and fair review of the denial decision, also required under ERISA. Accordingly, an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA. This procedural violation must be weighed by the district court in deciding whether [the administrator] abused its discretion.

458 F.3d at 974 (internal quotation marks, alterations and citations omitted).

**[13]** In *Abatie*, the beneficiary presented evidence in the district court bearing on the new issue, but the court refused to consider it. *Id.* We held that this was error, which must mean that a claimant in such circumstances is entitled to present evidence and to have the district court consider it. In addition, the fact that the claims administrator presented a new reason at the last minute bears on whether denial of the claim was the result of an impartial evaluation or was colored by MetLife's conflict of interest. After all, coming up with a new reason for rejecting the claim at the last minute suggests that the claim administrator may be casting about for an excuse to reject the claim rather than conducting an objective evaluation. *See* Langbein, *supra*, at 1321 (noting that UnumProvident claim administrators played on the deferential standard of review to deliberately deny meritorious claims). This is a matter to be resolved by the district court in the first instance, and we therefore vacate the district court's ruling and remand for this purpose.

In order to avoid unnecessary disputes on remand, we offer additional guidance for the parties and the district court: First, the district court must give Saffon an opportunity to present evidence on the one issue that was newly raised by MetLife in its denial letter—the results of a Functional Capacity Evaluation or other objective evidence of whether she is totally disabled under the terms of the Plan.[2] Saffon need not present

---

[2]In its petition for rehearing, Wells Fargo claims that our precedents forbid the district court from hearing additional evidence. *E.g.*, *McKenzie* v. *General Telephone Co. of Cal.*, 41 F.3d 1310, 1316 (9th Cir. 1994) (error for district court to hear additional evidence of disability not presented to plan administrator); *Taft* v. *Equitable Life Assur. Soc'y*, 9 F.3d 1469, 1472 (9th Cir. 1993) (same). But *Abatie* held that district courts may take additional evidence whenever "[procedural] irregularities have prevented full development of the administrative record," *Abatie*, 458 F.3d at 973, and

the results of such an evaluation, though she should be allowed to do so if she wishes. However, Saffon may, instead, offer evidence (from Dr. Kudrow or some other qualified expert) that such evidence is not available or not particularly useful in diagnosing her ability to return to her job. In this regard we note our case law in Social Security disability cases, *e.g.*, *Cotton* v. *Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) (per curiam), where we have noted that individual reactions to pain are subjective and not easily determined by reference to objective measurements. *See also Bunnell* v. *Sullivan*, 947 F.2d 341, 348 (9th Cir. 1991) (en banc) (affirming *Cotton*); *Fair* v. *Bowen*, 885 F.2d 597, 601 (9th Cir. 1989) ("[P]ain is a completely subjective phenomenon" and "cannot be objectively verified or measured.").[3] If MetLife is turning down Saffon's application for benefits based on Saffon's failure to produce evidence that simply is not available, that too may bear on the degree of deference the district court shall accord MetLife's decision and on its ultimate determination as to whether Saffon is disabled.

Second, in determining the degree of deference to which MetLife is entitled, the district court must consider MetLife's course of dealing with Saffon and her doctors. We have already pointed out some of the ways in which MetLife did

to the extent that our earlier cases conflict with *Abatie*, a later en banc decision, those cases are no longer good law. Here, MetLife failed to have a meaningful dialogue with Saffon, and that procedural irregularity prevented full development of the administrative record because it prevented Saffon from obtaining the Functional Capacity Evaluation that MetLife now claims to need. Therefore, the district court may take additional evidence. *Id.*

[3]While the rules and presumptions of our Social Security case law do not apply to ERISA benefits determinations, *see Black & Decker Disability Plan* v. *Nord*, 538 U.S. 822 (2003), our Social Security precedents are relevant for the factual observation that disabling pain cannot always be measured objectively—which is as true for ERISA beneficiaries as it is for Social Security claimants.

not meet its duty—outlined 10 years ago in *Booton*—to have a meaningful dialogue with its beneficiary in deciding whether to grant or deny benefits. MetLife seems to have disregarded this responsibility in various ways—the opacity of its communications with Saffon, the fact that it communicated directly with her doctors without advising her of the communication[4] and the fact that it took various of her doctors' statements out of context or otherwise distorted them in an apparent effort to support a denial of benefits.[5] *See* Langbein, *supra*, at 1319 (noting allegations of a physician claims reviewer for UnumProvident "that he was instructed 'to use language to support the denial of disability insurance'; that he was not allowed 'to request further information or suggest additional medical tests'; and that he was 'not supposed to help a claimant perfect a claim' " (alterations omitted)).

---

[4]For example, the letter to Dr. Kudrow, giving him 10 days to respond if he disagreed with Dr. Thomas's second review, appears not to have been sent to Saffon. Dr. Kudrow missed the 10-day deadline and, because Saffon was not notified, she was not in a position to urge him to timely respond or ask MetLife to extend the deadline. MetLife also seems to have communicated directly with Dr. Soderlund, Saffon's primary care physician, who had very little to do with Saffon's treatment for her back injury. A doctor is not a lawyer; though he may provide information that is relevant to a claimant's disability, his actions (or inaction) cannot bind the client. If a claims administrator communicates with a doctor who has treated a beneficiary, it must disclose that fact to the patient at a meaningful time.

[5]MetLife, for example, relies on Dr. Kudrow's suggestion that Saffon try returning to work, but omits this important qualifier: "*if she feels that she is able*." Letter from Dr. David Kudrow re: Graciela Saffon (Jan. 29, 2003). There is a world of difference between saying that a patient can return to work and saying she should return to work *if* she feels she is able to do so: Omitting the distinction could be a sign of either inattention to important details or bad faith. In either event, it suggests less deference should be given to the decision of the claims administrator. *See* Langbein, *supra*, at 1333-34 (citing *Brown* v. *Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1566 (11th Cir. 1990)) (courts should "insist[ ] on de novo review despite contrary plan terms in cases involving conflicted decision-making").

Finally, after determining the degree of deference (if any) it should accord MetLife's decision, the district court must determine whether Saffon is permanently disabled, taking into account not only the evidence presented in the record, but such additional evidence as Saffon may present (as discussed above) and any contrary evidence MetLife may present.[6] If the parties wind up presenting significant new evidence in the district court, it may be impossible for the court to grant *any* deference to the decision of the claims administrator, as that decision will perforce have been made without taking into account the new evidence. As a practical matter, therefore, it may be unnecessary for the district court to determine the degree of deference to give MetLife's decision, as the admission of significant new evidence will require a de novo reconsideration of the decision in any event.

**VACATED and REMANDED.**

---

[6]Wells Fargo's petition for rehearing claims that only plan administrators have authority to determine whether Saffon is disabled; the district court may not do so. *See, e.g.*, *Saffle* v. *Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir. 1996) (remanding to plan administrator, rather than district court, to determine whether claimant was disabled); *Patterson* v. *Hughes Aircraft Co.*, 11 F.3d 948, 951 (9th Cir. 1993) (same). But we have held that, where procedural irregularities have prevented full development of the administrative record, the district court may hear additional evidence. *See Abatie*, 458 F.3d at 973. There would be no point in taking additional evidence in the district court if the court were not authorized to decide the issue. *See id.* at 974 (remanding to the district court rather than the plan administrator).