Janice TAYLOR, Plaintiff,

v.

**SMITHKLINE BEECHAM CORPORATION, a GlaxoSmithKline Company Long Term Disability Plan, Defendant.**

No. 2:07–cv–0809–FMC–JTLx.

United States District Court, C.D. California.

June 26, 2009.

Brent Dorian Brehm, Corinne Chandler, Glenn R. Kantor, Kantor and Kantor LLP, Northridge, CA, for Plaintiff.

Cynthia L. Sands, Gonzalez Saggio & Harlan LLP, Irwin S. Evans, Atkins & Evans, Los Angeles, CA, for Defendant.

## ORDER ON ADMINISTRATIVE REVIEW

FLORENCE–MARIE COOPER, District Judge.

The matter is before the Court on administrative review. The Court has read and considered the parties' briefs and the administrative record. As explained herein, and in the manner set forth below, the Court reviews the administrative decision under an abuse of discretion standard and concludes that Plaintiff Janice Taylor is entitled to benefits under the LTD Plan.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises out of Plaintiff Janice Taylor's claim for long term disability benefits governed by the Employee Retirement Income Security Act ("ERISA"). Plaintiff is a former employee of GlaxoSmithKline, and was a plan participant of Defendant SmithKline Beecham Corporation, A GlaxoSmithKline Company Long Term Disability Plan ("SmithKline" and "LTD Plan"). (Compl. 2–3.) The LTD Plan is self-funded by SmithKline, which also acts as the Plan Administrator and possesses discretionary authority to review claims and interpret claim provisions. (GSK 023.) SmithKline delegates the task of claims administration to a third party. For the time period relevant to the Court's administrative review, claims administration was performed by Hartford–Comprehensive Employee Benefit Service Company ("Hartford"). The Administration Agreement provides that Hartford will perform an initial claim review and if requested by the plan participant, SmithKline will perform a final review. (Chandler Decl., Ex. F.)

Plaintiff was employed as a phlebotomist for SmithKline. After developing carpal metacarpal instability in her left hand,

Plaintiff filed a long term disability claim with SmithKline in November of 1995. Plaintiff began receiving disability benefits in July 1996. At the time, SmithKline delegated claims administration to ITT Hartford Life Insurance Company, who determined that Plaintiff was eligible for LTD benefits. (GSK 1066.) During the course of her claim and receipt of LTD benefits, the claims administrator changed several times. In 1998, UnumProvident Corp. ("Unum") began to provide claims administration services to SmithKline. In December 1999, Unum asked Plaintiff to submit proof of continued disability. (GSK 447.) Plaintiff submitted an Attending Physician's Statement and Physical Abilities Form in February 2000 and May 2000 from her treating hand physician, Dr. Kendrick Lee. Unum also received a statement from Dr. William Lowrey in February 2001. These documents indicated Plaintiff could lift or carry 20 pounds frequently, 30 pounds occasionally, had limited sitting and stooping/bending, and could perform simple grasping, fine manipulation, pushing, pulling and repetitive motion with the left hand for up to two-thirds of a workday. (GSK 320, 381, 439.)

On this basis, Unum conducted an Employability Assessment, determined Plaintiff could perform eleven occupations including her former position as Phlebotomist, and denied her benefits in April 2002. (GSK 362–364.) Plaintiff appealed Unum's decision, and submitted additional reports from Dr. Lee dated October 2002 and findings of an Administrative Law Judge granting her Social Security disability benefits in December 2002. In addition to left hand pain and limited thumb and wrist mobility, these documents showed Plaintiff suffers from seizures, protein-S deficiency, and has a history of deep venous thrombosis. These ailments cause distorted vision, impaired consciousness, and pain and blood clots in her right leg, preventing her from sitting for long periods of time. (GSK 343–346.) With this information, Unum's reviewing physician added restrictions of no repetitive movement with the thumb and no pinching or grasping activities. A second Employability Analysis revealed that the additional restrictions eroded the job base by 90%, and found only one acceptable occupation— gate guard. (GSK 334.) With these results, Unum reversed its prior decision, and reinstated Plaintiff's disability benefits on January 27, 2003. (GSK 320–323.)

On January 1, 2004, Hartford–Comprehensive Employee Benefit Service Company ("Hartford") replaced Unum as the claims administrator for the LTD Plan. Soon thereafter, on February 19, 2004, Hartford decided to reassess Plaintiff's eligibility for benefits, which is permitted by the LTD Plan on an annual basis. (GSK 018; H 027.) Hartford asked that Plaintiff submit proof of ongoing disability, including an Attending Physician Statement ("APS") from her treating physician within twenty-one (21) days. (GSK 266.) Plaintiff called Hartford on March 19, 2004 to explain her medical condition and her planned visit with a hematologist in May 2004. Hartford stated it would follow up with her in mid-June. (H 026.) Hartford sent additional requests for an APS in March, June, and July 2004. On July 20, 2004 and August 4, 2004, Plaintiff's daughter called Hartford to explain that Plaintiff was in South America on a family emergency and would not be back until August 19, 2004. Hartford responded that it could not provide an extension past July 31st. (H 026.) On August 5, 2004, Hartford received an APS faxed from Dr. Lee's office. However, the APS was based upon an examination date of October 23, 2002, and Dr. Lee had not examined Plaintiff since. Hartford rejected the APS and wrote to Plaintiff explaining that she had

to submit an APS based on a current exam, because the policy requires that she be under the regular care of a physician. (GSK 262.) Hartford sent additional notices requesting an APS in October and November 2004, and a final notice on January 7, 2005, giving Plaintiff 21 days to return the requested information. After returning from South America, Plaintiff informed Hartford in several phone calls that she was having trouble getting her Workers Compensation to approve a visit with her treating physician, and that she suffered a stroke in November 2004, was hospitalized for two weeks, and was getting treatment for possible thyroid cancer. (H 024–025.)

On January 27, 2005, Hartford received the requested documents, and an APS from Dr. Lee's office, Plaintiff's treating hand physician, based on an exam conducted on October 25, 2004. The APS, signed December 13, 2004, indicated Plaintiff's status was unchanged and her thumb pinching restriction was permanent. (GSK 254–255.) Plaintiff also described her other ailments in a Claimant Questionnaire. (GSK 249–252.) However, on January 25, 2005, Hartford initiated the termination process and generated a letter terminating Plaintiff's benefits on the basis of failing to provide documentation of ongoing disability. (H 023.) Hartford signed and issued the termination letter on January 28, 2005, 21 days after its final notice dated January 7, 2005. (GSK 256–258.)

Having received the requested documentation, Hartford decided to conduct an Employability Analysis ("EA") prior to re-opening Plaintiff's claim. The only restriction considered by the EA was pinching activities performed by the left thumb, as noted in Dr. Lee's recent APS. The EA also considered that Plaintiff had been able to attend Mills College to earn a Bachelor's degree in May 1999. The EA concluded Plaintiff could work in seven (7) occupations that are prevalent in the economy. From these results, Hartford decided to deny Plaintiff's claim on the merits, and issued a denial letter on March 3, 2005. Plaintiff was given 180 days to appeal the decision. (GSK 214–217.)

On August 15, 2005, Plaintiff sent a letter to Hartford's Appeals Unit, appealing the decision to deny and terminate benefits. Plaintiff described her hand limitations, protein S deficiency, seizure disorder, and venous insufficiency of lower extremities. Plaintiff objected to Hartford's EA, because it changed Plaintiff's ability to handle objects from occasionally to constantly, even though handling objects requires Plaintiff to both pinch and grip. Plaintiff attached documentation of her hospitalization in November 2004 at the Alta Bates Medical Center for her stroke, treatment in March 2005 for her hands at a Hand Therapy & Acupuncture center, and documents already in Hartford's possession, such as the ALJ decision to award her Social Security disability benefits in December 2002. Plaintiff also requested an extension of time to submit additional medical records, as she was once again having difficulty securing approval to visit her treating physician from her workers' compensation carrier.

In a letter dated September 1, 2005, Hartford denied Plaintiff's request for an extension, and informed her she would have to send her completed appeal to Hartford by November 1, 2005, pursuant to the 180–day deadline. Plaintiff requested another extension on October 30, 2005, because her next appointment with Dr. Lee was scheduled for December 5, 2005. Hartford called Plaintiff on November 14, 2005 and informed her that no additional medical information would be considered or sent to the independent physician con-

sultant at University Disability Consortium ("UDC"), because the review is based on Plaintiff's condition as of January 2005, the date benefits were denied, and because her appeal was complete as of November 1, 2005. The only opportunity for the independent consultant to consider additional information would his telephone consultations with Plaintiff's treating physicians. (GSK 046.)

Meanwhile, at some point in November 2005, Hartford sent all of Plaintiff's medical records in its possession as of November 1, 2005 to Dr. Beth Aaronson of UDC for an independent medical review. Between November 1, 2005 and December 30, 2005, Plaintiff submitted additional medical records to Hartford that were not provided to Dr. Aaronson, including: (1) an evaluation by Alta Bates Medical Center for suspected thyroid cancer dated December 14, 2004; (2) a radiology report dated November 4, 2005 that found facet joint arthropathy and mild anterolisthesis; (3) a venous doppler study of Plaintiff's right leg showing evidence of recanalized deep venous thrombosis dated November 18, 2005, which was previously noted in November 2004; and (4) an attending physician statement by Dr. Lee dated December 5, 2005, reiterating her left thumb symptoms have not improved. Hartford granted itself and Dr. Aaronson a 45–day extension to conduct the appeal.

On December 30, 2005, Dr. Beth Aaronson of UDC prepared a medical record review of Janice Taylor. (GSK 028.) Dr. Aaronson is Board Certified in Physical Medicine and Rehabilitation. (GSK 037.) She made multiple calls to Plaintiff's treating physicians, but was not successful in reaching them, as many were on vacation or did not return calls. (GSK 036.) Based upon her review of the medical records, Dr. Aaronson concluded that Plaintiff could perform sedentary work activities. Dr. Aaronson explained that Plaintiff's primary restriction was in the use of her left arm, such as repetitive wrist motion, pinching and grasping, and lifting more than 10 pounds. Dr. Aaronson noted Plaintiff's stroke, but determined that she was able to return to full independent function without symptoms or limitations. "There are no restrictions for standing, sitting, walking, or driving. There are no significant restrictions for bending, reaching, or working overhead." (GSK 037.)

Based upon Dr. Aaronson's report, Hartford conducted an Amended Employability Analysis ("Amended EA") on January 4, 2006. Hartford adjusted Plaintiff's physical demand profile by changing "handling and fingering" from constantly to occasionally, and by changing "reaching, handling, and feeling" from an unknown level to constantly, because "there is no medical information to indicate the claimant is unable to perform these activities." (GSK 048.) The Amended EA also noted that because Plaintiff completed a Liberal Arts degree since the onset of disability, she must have had some bilateral use of her hands, even if she was accommodated. (GSK 049.) The Amended EA concluded Plaintiff could perform three (3) occupations out of a dictionary of over 12,000 occupations: Call-out Operator, Insurance Clerk, and Surveillance System Monitor. The first two would not require additional training, while the third would require some additional training. These occupations were selected because they did not require repetitive hand activities and did not otherwise require intensive use of the hands. (GSK 049.)

On January 9, 2006, Hartford sent Plaintiff a letter summarizing its reasons for and affirming its earlier decision to deny LTD benefits. The letter noted the Social Security Administration's ("SSA") previous award of disability benefits had no bearing on Hartford's determination, because the

SSA employs a different standard of review. The letter also informed Plaintiff of her right to appeal the decision directly to her Plan Sponsor, SmithKline. (GSK 045–047.)

In a letter dated March 6, 2006, Plaintiff appealed Hartford's decision to SmithKline for the first time. Plaintiff's letter offered several reasons for her appeal: (1) Hartford refused to review medical records acquired after November 1, 2005, though Plaintiff was not at fault for failing to procure earlier appointments with her physicians; (2) her right hand suffers from similar conditions as her left hand; (3) Hartford did not consider Plaintiff's blood clotting disorder, which prevents her from sitting, stooping, and bending; (4) Hartford did not consider Plaintiff's arthritis in her spine; and (5) Hartford failed to recognize that she earned her Liberal Arts degree with the help of the school's Disabled Student Services. (GSK 955–956.)

In reviewing Plaintiff's appeal, SmithKline employed the services of Dr. Ann Kuhnen to review Plaintiff's medical records. Dr. Kuhnen is SmithKline's in-house physician and medical reviewer who is board certified in occupational, environmental, and family medicine. Dr. Kuhnen has never had a private practice. (Chandler Decl., Ex. A at 10:16–18.) In performing this review, Dr. Kuhnen was not provided with Plaintiff's appeal letter dated March 6, 2006. (Chandler Decl., Ex. A at 36–37.) On the other hand, Dr. Kuhnen had access to Plaintiff's complete medical record, including the documents submitted by Plaintiff after November 1, 2005–Dr. Lee's APS dated December 5, 2005, a Venous Doppler study conducted November 18, 2005, and the Social Security Administration's award of disability benefits.

Dr. Kuhnen prepared a memo dated June 2, 2006, outlining her review of Plaintiff's medical records. Dr. Kuhnen "relied heavily" on the UDC report prepared by Dr. Aaronson and found it to be highly credible and consistent with the opinion of Plaintiff's treating hand physician, Dr. Lee. At her deposition, Dr. Kuhnen testified that though she relied heavily on Dr. Aaronson's report, she did not rely exclusively on that report in making her recommendation. Dr. Kuhnen noted that Plaintiff suffered from a propensity to ·develop blood clots due to protein S deficiency, venous insufficiency of her right leg, left volar wrist ganglion, and temporal lobe epilepsy. Nonetheless, Dr. Kuhnen reached a conclusion similar to that of Dr. Aaronson–Plaintiff has permanent restrictions in the use of her left hand, but does not suffer from other "impairments or restrictions that would prevent her ·from being gainfully employed." (GSK 856.) At her deposition, Dr. Kuhnen testified that she determined Plaintiff could perform sedentary work with accommodations. (Chandler Decl., Ex. A at 54–55.) Dr. Kuhnen recommended upholding the denial of LTD benefits.

That same day, June 2, 2006, SmithKline advised Plaintiff that it would affirm Hartford's ˙ termination of LTD benefits. SmithKline informed Plaintiff that she could appeal one more time, and submit additional facts or data that were not previously considered. (GSK 968.)

In a letter dated June 30, 2006, Plaintiff appealed the denial of benefits to SmithKline for the second time. The letter explained that Hartford and SmithKline failed to consider all her medical records, such as her venous insufficiency, which prevents stooping, sitting, and standing for prolonged periods. The letter also took issue with Hartford's Amended Employability Analysis ("Amended EA"). Plaintiff requested a 45–day extension to submit additional medical records. (GSK 957.)

On July 7, 2006, SmithKline faxed a copy of Plaintiff's appeal letter dated June

30, 2006 to Hartford, asking Hartford to comment on the issues raised in the letter, including her objections to the Amended EA. (H 063.) There is no evidence that Hartford ever responded to SmithKline's request for comment.

In a letter dated August 11, 2006, Plaintiff reiterated her inability to perform the occupations listed in the Amended EA. Plaintiff attached additional documents, most of which had been previously submitted to Hartford or SmithKline. (GSK 930–958.)

SmithKline again employed Dr. Kuhnen to review Plaintiff's second appeal. SmithKline provided Dr. Kuhnen with all documents submitted by Plaintiff, including each of her appeal letters, and the most recent documents submitted on August 11, 2006. In a memo dated September 5, 2006, Dr. Kuhnen offered her recommendation once again to deny LTD benefits to Plaintiff, as her analysis was not altered by the supplemental information. (GSK 925.) Dr. Kuhnen incorrectly noted Dr. Aaronson of UDC must have had complete access to Plaintiff's medical records. (GSK 925.) Dr. Kuhnen explained again that Plaintiff's permanent left hand restrictions clearly disable her from her "own job," but not necessarily from "any occupation." (GSK 926.) "Ms. Taylor's other medical problems are also well documented in her original LTD file and were considered by Dr. Aaronson as well as myself ... The supplemental information does not change the analysis because it does not offer any statement of additional impairments that would alter the disability analysis." (GSK 926.)

In a letter dated September 15, 2006, SmithKline informed Plaintiff that it had reached its final review and determination to deny Plaintiff LTD benefits. The letter summarized the reasons for its decision, and noted that a Social Security award of disability benefits is unrelated to the eval-uation of disability under the terms of the LTD Plan. At deposition, SmithKline's representative, Suzanne Donnelly, and Dr. Kuhnen testified that they do not know the specific criteria for disability promulgated by the Social Security Administration, nor how it is different from the terms of the LTD Plan. (Chandler Decl., Ex. A at 26–29 & Ex. B at 39.) The letter also informed Plaintiff that she had exhausted all administrative remedies available under the LTD Plan. (GSK 923.) Plaintiff thereafter sought review from this Court and filed her Complaint on February 2, 2007.

## II.  LEGAL STANDARD

The Supreme Court has held that a denial of benefits under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA") "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ("Firestone Tire"). "When a plan unambiguously gives the plan administrator discretion to determine eligibility or construe the plan's terms, a deferential abuse of discretion standard is applicable." *Burke v. Pitney Bowes, Inc. Long–Term Disability Plan,* 544 F.3d 1016, 1023–24 (9th Cir. 2008) (citing *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 963 (9th Cir.2006) (en banc)).

In *Metropolitan Life Ins. Co. v. Glenn,* — U.S. ——, 128 S.Ct. 2343, 2346, 171 L.Ed.2d 299 (2008), the Supreme Court set forth a framework, similar to the one provided in *Abatie,* to assess whether the dual role of administering and funding an ERISA plan creates a conflict of interest, and if so, how that conflict should be considered in evaluating whether a plan ad-

ministrator has abused its discretion. The Court reiterated the principles established in *Firestone,* and noted, "[i]n 'determining the appropriate standard of review,' a court should be 'guided by principles of trust law,'" and "[i]f 'a benefit plan gives discretion to an administrator or fiduciary who *is operating under a conflict of interest,* that conflict must be *weighed as a factor* in determining whether there is an abuse of discretion.'" *Metropolitan Life Ins.,* 128 S.Ct. at 2347–48 (emphases in original) (citing *Firestone,* 489 U.S. at 115, 109 S.Ct. 948).

A conflict of interest is clearly present "where it is the employer that both funds the plan and evaluates the claims." *Id.* at 2348. The Court noted that the abuse of discretion standard of review still applied despite the structural conflict of interest. *Id.* at 2349–50. However, after concluding a conflict of interest exists, a reviewing court must:

> take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion.... [C]onflicts are but one factor among many that a reviewing judge must take into account.... The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Burke,* 544 F.3d at 1025 (quoting *Metropolitan Life Ins.,* 128 S.Ct. at 2350–51). In other words, a structural conflict of interest and the circumstances surrounding the conflict, are weighed and taken into account to determine whether the plan administrator has abused its discretion.

▮▮▮▮ "[I]n general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion, but may admit additional evidence on de novo review." *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 970 (9th Cir.2006). The administrative record generally consists of the record that was before the administrator when the decision was made. *Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 976–77 (9th Cir.1999). "The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decisionmaking process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Id.* (citing *Doe v. Travelers Ins. Co.,* 167 F.3d 53, 57 (1st Cir.1999)).

## III. DISCUSSION

The SmithKline Long Term Disability Plan defines "Total Disability" as:

- During the first two years of LTD benefits—you are unable to perform all the duties of your job
- After the first two years of LTD benefits—you are unable to perform any job for which you are reasonably qualified or may become qualified because of your education, training and experience

(GSK 015.) The applicable definition of Total Disability in this case is the post-two year definition that requires an inability to perform "any job."

## A. Standard of Review

The Court previously determined the standard of review and amount of deference to be accorded SmithKline's decision to terminate Plaintiff's LTD benefits in its Order dated December 5, 2008. The Court determined that an abuse of discretion standard of review is appropriate, but recognized that several conflicts of interest and procedural irregularities should be weighed into whether SmithKline abused its discretion in denying LTD benefits. The Court discussed the structural conflict of interest inherent in the LTD Plan, because SmithKline possesses final decision-making authority to approve or deny claims, and is also the funding source for the LTD Plan. The Court also expressed concern over a host of "procedural irregularities," which act to reduce the level of deference accorded to SmithKline's decision. These irregularities are summarized as follows:

First, Dr. Kuhnen erroneously presumed that Dr. Aaronson had access to and reviewed several documents submitted by Plaintiff between November 1, 2005 and December 30, 2005. Dr. Kuhnen "relied heavily" upon Dr. Aaronson's conclusions and findings. (GSK 925.) Second, Hartford refused to forward documents it considered untimely to Dr. Aaronson, namely those submitted between November 1, 2005 and December 30, 2005. SmithKline also failed to forward Plaintiff's March 6, 2006 appeal letter to Dr. Kuhnen when she performed her first review of the record. (Chandler Decl., Ex. A at 36:20–37:17.) The Court acknowledges that Dr. Kuhnen was in possession of Plaintiff's entire medical record and appeal letters during her second review of the record.

Third, similar to one of the factors weighed in *Metropolitan Life Ins.*, the LTD Plan requires a plan participant to apply for Social Security disability benefits through the Administrative Law Judge hearing level, but SmithKline gives little or no weight to a Social Security finding of disability. (GSK 644, 822; Chandler Decl., Ex. A at 28:23–29:11). *See Metropolitan Life Ins. Co. v. Glenn*, —— U.S. ——, 128 S.Ct. 2343, 2352, 171 L.Ed.2d 299 (2008) ("In particular, the court found questionable the fact that MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so ... and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work."). The LTD Plan in this case likewise deducts any Social Security income received from the gross monthly LTD benefit. (GSK 205.)

Fourth, Plaintiff has qualified for long term disability benefits for approximately ten years, but SmithKline's doctor found it difficult to identify specific improvements in Plaintiff's condition. (Chandler Decl., Ex. A at 29:12–30:22.) The Court discusses this issue further in its review of the administrative record.

Fifth, in her recommendation that SmithKline deny Plaintiff LTD benefits, Dr. Kuhnen testified at deposition that she determined Plaintiff could perform sedentary work with accommodations. (Chandler Decl., Ex. A at 55.) It is unclear whether Dr. Kuhnen meant Plaintiff could work "only with accommodations" or "with accommodations and without accommodations." The Court notes the LTD Plan does not refer to accommodations and defines "Total Disability" as, "unable to perform any job for which you are reasonably qualified or may become qualified because of your education, training or experience." (GSK 015). SmithKline should not have denied LTD benefits based upon a finding that Plaintiff could perform sedentary work only with accommodations. *Cf. Saffle v. Sierra Pacific Power Co. Bargaining*

*Unit LTD Income Plan,* 85 F.3d 455, 459 (9th Cir.1996) ("We ... hold that interpreting the Plan's definition of 'total disability' to include modifications or accommodations to 'work available for which she is qualified' was contrary to its plain language.").

The Court previously determined that these conflicts of interest and procedural irregularities are "significant," and will be weighed in the Court's evaluation of whether SmithKline abused its discretion.

## B. Review of the Administrative Record

### 1. The medical records support a finding of total disability

Both Hartford and SmithKline's reviewing physicians agreed that Plaintiff could not lift more than ten (10) pounds, could not pinch or grasp with her left hand, and could not perform any repetitive activity with her left hand. Based upon these restrictions, Hartford's Employability Analysis ("EA") found just three (3) occupations Plaintiff could perform, out of a dictionary of over 12,000 titles. The medical record indicates Plaintiff suffered from additional ailments not related to her left hand, including temporal lobe epilepsy, protein S deficiency, and deep venous thrombosis, leaving Plaintiff in a hypercoagulable state—prone to blood clotting. These additional conditions were recognized by Defendant's physicians and appear to be permanent. They also give rise to additional sitting, standing, and stooping limitations, that were recognized by Dr. William A. Lowery on February 15, 2001, a Social Security Administrative Law Judge on December 27, 2002, and UnumProvident in January 2003.[1] (GSK 331, 341, 345, 381.) Unum performed an EA in January 2003 that took into consideration all of Plaintiff's physical limitations and found that Plaintiff could only perform one occupation-gate guard. Plaintiff's medical history has continued to deteriorate since then, and supports a finding of total disability as defined by the LTD Plan.

The Court also notes that in its Amended EA, Hartford assigned an inappropriate physical demand profile to Plaintiff. Hartford determined Plaintiff could perform the following activities, "reaching, handling, feeling, talking, hearing, tasting/smelling, near acuity, far acuity, depth perception, color vision, field of vision," constantly. Plaintiff can likely perform the speaking, hearing, tasting, smelling, and sight functions of this group. However, Plaintiff's hand restrictions should have interfered with her ability to constantly reach, handle, and feel objects.

### 2. Termination of existing LTD benefits without any sign of improvement and without an adequate explanation

■ Plaintiff argues that SmithKline abused its discretion in terminating Plaintiff's LTD benefits after having granted them for ten years, without any showing that Plaintiff's medical condition had improved. (Pl.'s Opening Br. at 22.) Defendant responds that a showing of improvement is not required in order to terminate benefits previously granted. Defendant

---

1. Though not part of the administrative record, Dr. Kuhnen testified at deposition that it would be reasonable to expect that someone with a hypercoagulable state would have restrictions against sitting for long periods of time. (Chandler Decl., Ex. A at 36.) The Court may consider this evidence in weighing the extent of Dr. Kuhnen's conflict of interest that may be revealed by her deposition testimony. *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 970 (9th Cir.2006). The Court notes that Dr. Kuhnen was aware of Plaintiff's hypercoagulable state (GSK 854), but did not advocate any sitting restrictions in her memo to SmithKline.

cites a Fifth Circuit decision, which held in part that a showing of improvement is not required. *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 274 (5th Cir.2004) ("A plan fiduciary that has granted plan benefits to a participant or beneficiary is not estopped from terminating those benefits merely because there is no evidence that a substantial change in the covered employee's medical condition occurred after the original grant of benefits.").

Though the court held that a showing of improvement is not necessary, the plan fiduciary in *Ellis* reached its decision to terminate benefits based upon "additional medical evidence" that showed a lack of disability. The court's more general holding suggests that to terminate existing benefits, a plan fiduciary must obtain some sort of additional information showing that the employee was never disabled to begin with, is not currently disabled, or is no longer disabled, and offered the following reasoning:

> We hold that when a plan fiduciary initially determines that a covered employee is eligible for benefits and later determines that the employee is not, or has ceased to be, eligible for those benefits *by virtue of additional medical information received*, the plan fiduciary is not required to obtain proof that a substantial change in the LTD recipient's medical condition occurred after the initial determination of eligibility. Indeed, evidence could exist—as it did here—at the time that the plan fiduciary initially granted benefits that demonstrates that the ERISA plaintiff is not totally disabled. In addition, a plan fiduciary could receive evidence that an ERISA plaintiff is not totally disabled months after it has made the initial grant of benefits.

*Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 274 (5th Cir.2004).

This Court does not disagree with the Fifth Circuit's determination that a plan fiduciary need not rely exclusively upon evidence of improvement to justify a termination of existing benefits. A plan fiduciary should be able to rely upon recently acquired evidence showing that an employee was never disabled to begin with. However, no such evidence exists in this case. There is no evidence in the record that Plaintiff's medical condition has improved, or that SmithKline's prior determination to grant LTD benefits is no longer valid. The primary changes occurred in the administration of the LTD Plan. The claims administrator changed from Unum-Provident to Hartford, and Hartford's reviewing physician offered a different opinion. Defendant argues that a change in the available job base rendered Plaintiff no longer disabled. (Def. Br. at 26.) However, Plaintiff's job base grew from one to three because Hartford's physician determined Plaintiff could perform sedentary activities, though Unum's physician previously determined she could not.

Moreover, the Ninth Circuit has suggested that absent some other explanation, a showing of improvement is expected in order to justify a termination of existing benefits:

> MetLife does not explain why further degeneration is necessary to sustain a finding that Saffon is disabled. After all, MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled. In order to find her no longer disabled, one would expect the MRIs to show an improvement, not a lack of degeneration.

*Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir.2008); *see also McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir.2002) ("We are not suggesting that

paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments.").

Here, there is no evidence suggesting that any of Plaintiff's medical conditions have improved. Neither Hartford nor SmithKline's reviewing physicians have offered any plausible explanation as to why Plaintiff can now perform sedentary activities without sitting, standing or stooping limitations when UnumProvident previously determined that she could not. For example, Hartford's reviewing physician, Dr. Beth Aaronson of UDC,[2] issued a report dated December 30, 2005.[3] Dr. Aaronson was aware of most of Plaintiff's medical conditions, and took note of Plaintiff's entire medical record through November 1, 2005. This includes evidence of the same conditions relied upon by Unum-Provident in its decision to grant LTD benefits, such as the temporal lobe epilepsy, protein S deficiency, and deep venous thrombosis. Nonetheless, Dr. Aaronson's evaluation of Plaintiff's ability to work only discusses the medical conditions affecting Plaintiff's "left upper extremity" or left arm. Dr. Aaronson does not explain how Plaintiff's other conditions no longer prevent her from performing sedentary activities without any sitting, standing, or stooping limitations. Dr. Aaronson only notes that Plaintiff suffered a stroke, but dis-

misses it as a temporary event, with "no significant deficit." (GSK 037.) Dr. Aaronson does not mention Plaintiff's epilepsy, protein S deficiency or deep venous thrombosis in her evaluation of the extent to which Plaintiff can work.

Similarly, SmithKline's reviewing physician, Dr. Ann Kuhnen, "relied heavily" on Dr. Aaronson's report, and did not offer any meaningful discussion regarding the medical conditions not related to Plaintiff's left hand. Dr. Kuhnen's memo to Smith-Kline, dated June 2, 2006, concludes in a perfunctory manner, "[t]he medical information consistently over years supports the same permanent restrictions for her Left hand, but do not offer any other impairments or restrictions that would [ ] prevent her from being gainfully employed." (GSK 856.) After reviewing Plaintiff's file a second time, Dr. Kuhnen erroneously noted in her September 5, 2006 memo that Dr. Aaronson must have reviewed the documents submitted between November 1, 2005 and December 30, 2005. The same memo also summarily dismisses each of Plaintiff's non-hand related conditions. Dr. Kuhnen dismisses them because the recent documentation provided for these conditions, do not "speak to impairments or physical restrictions that would prevent Ms. Taylor from doing sedentary work." (GSK 855.)

Without a clear explanation of why Plaintiff should be considered no longer disabled, it appears to the Court that SmithKline reached its decision due to

---

**2.** Courts have recognized the close working relationship between Hartford and UDC, and noted a conflict of interest. *See, e.g., Caplan v. CNA Financial Corp.,* 544 F.Supp.2d 984 (N.D.Cal.2008) ("In addition, Hartford's structural conflict of interest is accompanied by its reliance on UDC, a company which Hartford knows benefits financially from doing repeat business with it, collecting more than thirteen million dollars from Hartford since 2002.").

**3.** Hartford did not forward to Dr. Aaronson the documents Plaintiff submitted after November 1, 2005. The post-November 1, 2005 documents confirmed Plaintiff's deep venous thrombosis and left hand restrictions. A radiology report also found facet joint arthropathy or degenerative arthritis of the spine, which suggests Plaintiff's overall medical condition was deteriorating.

Plaintiff's failure to submit recent medical evaluations containing specific restrictions or limitations on Plaintiff's ability to perform sedentary work—i.e., sitting or standing restrictions. However, neither SmithKline nor Hartford ever clearly notified Plaintiff of its underlying reason for denial. The Ninth Circuit has been clear that a plan administrator "must provide a plan participant with adequate notice of the reasons for denial." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir.2006) (citing 29 U.S.C. § 1133(1)).

█ In the same vein, a plan administrator must provide a claimant with "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." *Booton v. Lockheed Medical Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir.1997); *accord Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir.2008) ("Insofar as MetLife believed that a Functional Capacity Evaluation, or some other means of objectively testing Saffon's ability to perform her job, was necessary for it to evaluate Saffon's claim, it was required to say so at a time when Saffon had a fair chance to present evidence on this point.") (citing 29 C.F.R. § 2560.503–1(f)). Both Hartford and SmithKline's reviewing physicians appear to have discounted Plaintiff's non-hand-related conditions because Plaintiff did not submit recent documentation showing that these conditions give rise to additional restrictions and limitations. As in *Saffon*, if SmithKline or Hartford believed a Functional Capacity Evaluation or some other medical report was necessary to verify Plaintiff's sitting, standing, and stooping restrictions, it should have clearly requested them. Instead, Hartford and SmithKline never informed Plaintiff in their denial letters that she should have submitted recent documentation to verify that her non-hand-related conditions give rise to additional restrictions or limitations.[4]

Failing to comply with these fundamental requirements of communication can alone constitute an abuse of discretion. *See Booton v. Lockheed Medical Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir.1997) ("Had Aetna requested the needed information and offered a rational reason for its denial, it would be entitled to substantial deference. But to deny the claim without explanation and without obtaining relevant information is an abuse of discretion."). Here, Hartford and SmithKline failed to adequately describe and explain what material or information was necessary for Plaintiff to perfect her claim. The Court considers this failure to communicate to be another significant procedural irregularity. Without clear guidance on how Plaintiff should go about perfecting her claim, Plaintiff was left to guess at what documents should have been submitted, rendering her chances of succeeding virtually nonexistent.[5]

---

**4.** The extent to which Hartford advised Plaintiff of what was needed to complete her claim is contained in its first denial letter dated January 28, 2005. The letter advised Plaintiff to submit "an Attending Physician's Statement of Continued Disability completed, signed and dated by your current treating physician outlining all restrictions and limitations placed on your physical activities based on a current examination." (GSK 257.) Plaintiff thereafter submitted an APS based on an October 2004 examination by her hand physician, Dr. Lee. No further explanation was provided in Hartford and SmithKline's subsequent denial letters of what was necessary to perfect Plaintiff's claim.

**5.** Plaintiff's inability to decipher what she should submit is evidenced by Dr. Kuhnen's statement in her memo to SmithKline that "Ms. Taylor provided what she believes is additional documentation to support her case. In reality, many of these records were indeed part of her LTD file that I reviewed." (GSK 854.)

Due to the significant conflicts of interest and procedural irregularities noted above, as well as the strong evidence of total disability and lack of improvement in Plaintiff's condition, the Court finds SmithKline to have abused its discretion in terminating Plaintiff's existing LTD benefits. The Court also finds that Plaintiff has met the LTD Plan's definition of "Total Disability," and is unable to perform any job for which she is reasonably qualified or may become qualified because of her education, training and experience.

## IV. CONCLUSION

For the foregoing reasons, the Court determines Plaintiff is entitled to disability benefits under the LTD Plan. Plaintiff is to prepare and lodge a proposed Judgment, consistent with this Order, within ten (10) days from the date of this Order.

**IT IS SO ORDERED.**