### Lynette DUVALL, Plaintiff,

v.

### RELIANCE STANDARD LIFE INSURANCE COMPANY and Does 1 to 100, Defendants.

### No. CIV. S–08–651 LKK/GGH.

United States District Court, E.D. California.

Aug. 13, 2009.

---

**1190**

David Allen, David Allen & Associates, Sacramento, CA, for Plaintiff.

Russell H. Birner, Wilson Elser Moskowitz Edelman & Dicker, Los Angeles, CA, for Defendants.

## ORDER

LAWRENCE K. KARLTON, Senior District Judge.

Plaintiff has brought suit under the Employee Retirement Income Security Act (ERISA) seeking review of the insurance claim administrator's determination of her entitlement to benefits. The parties have cross-moved for judgment under Federal Rule of Civil Procedure 52. The court resolves the motion on the papers and after oral argument. For the reasons stated herein, the court grants defendant's motion and denies plaintiff's.

## I. FACTS[1]

### A. Defendant's Long–Term Disability Plan

Plaintiff was a registered nurse employed by Marshall Medical Center and insured through her employer for group disability coverage by defendant. ICR at 234–35, 238. Among other things, the plan provided income replacement for eligible persons upon "total disability from sickness or injury." *Id.* at 238. "Total disability" is given a specific definition in the plan. First, it only encompasses disability arising from "injury or sickness." *Id.* at 246. Where a total disability is "caused by or contributed to by mental or nervous disorders," the claimant is only entitled to benefits for twenty-four months, unless the claimant is in a hospital or institution at the end of that time. *Id.* at 257. These

---

1. The facts described herein derive from the lodged insurance company's record. ("ICR"). The court uses the phrase Insurance Companies' Record, rather than Administrative Record, although Administrative Record has become customary in the field, because it suggests an independent record, which is false characterization of both the documents and their review.

include depressive disorders and anxiety disorders. *Id.*

Second, the definition of "total disability," for purposes of benefit eligibility, changes over time. The policy provides that "for the first 24 months for which a Monthly Benefit is payable," the claimant is totally disabled if, as a result of sickness or injury, the claimant "cannot perform the material duties of his/her regular occupation." *Id.* at 247. After the first 24 months, a claimant will only be considered totally disabled if he or she "cannot perform the material duties of any occupation ... that the [i]nsured's education, training, or experience will reasonably allow" *Id.*

## B. Plaintiff's Claim

### 1. Claim Documents Submitted By Plaintiff

On May 6, 2005, plaintiff filed a claim for total disability, stating that it was based on "exacerbated long term chronic low back pain with stiffness and muscle spasms" and that she was "unable to perform job requirements, extreme emotional distress 2° to this." *Id.* at 273; *see also id.* at 275 (stating that she ceased working at Marshall Medical Center due to inability "to perform duties required to worsening low back pain and extreme emotional stress"). She stated that her injury had occurred over time, resulting in a discectomy in 1998, and that she had experienced a "gradual decline since 2000." *Id.* She reported that she was last able to work on November 12, 2004.[2] *Id.* She listed Dr. Stephen Cyphers and Dr. Paul Sobelman as doctors who had treated her for the disabling condition. *Id.* at 276.

Her claim was supported by statements by three health care providers, Dr. Cy-

phers, Dr. Sobelman, and Brian Smith. *Id.* at 503–504, 583–86. Dr. Sobelman listed plaintiff's primary diagnosis as "diskogenic low back pain" and stated that secondary conditions contributing to the disability were "situational anxiety, depression." *Id.* at 503–504. He stated that plaintiff's condition was work-related because "physical activities cause increased back pain, increased emotional stress." *Id.* at 503. He referred plaintiff to Brian Smith for counseling. *Id.*

Brian Smith, a licensed clinical social worker, also submitted a statement in support of plaintiff's claim. He diagnosed plaintiff as having depressive disorder, with the secondary condition of back injury and chronic pain. *Id.* at 585. He stated that her condition was work-related because it created "contributory stresses." *Id.*

Finally, Dr. Cyphers, an orthopedist, gave plaintiff the primary diagnosis of "chronic low back pain" with secondary conditions of bowel problems. *Id.* at 583. Both Dr. Cyphers and Sobelman indicated that for an eight-hour period, plaintiff could perform sedentary work. *Id.* at 504, 583.

### 2. Defendant's Claim Decision

In review of the claim, defendant requested the three doctors provide copies of all medical treatment documents for the plaintiff. *Id.* at 179–83. There are several items in the record that were apparently provided in response.

In October 2003, Dr. Sobelman received a letter from Dr. Rajiv Pathak, a neurologist, who had seen plaintiff for a "follow-up."[3] *Id.* at 559. He reported plaintiff

---

**2.** On the claim form she wrote, "November 12, 2005," which appears to be an error in the year. *See* AR at 234.

**3.** The letter does not reveal what this is a follow-up for and neither party has directed the court to evidence in the record explaining the referral to Dr. Pathak.

having "cognitive difficulty" that was "slowly improving." *Id.* He performed an MRI and a spinal tap on her and all results were normal. *Id.* He concluded that there was no apparent neurological explanation for her "difficulty." *Id.*

In August 2004, Dr. Cyphers performed an "intense and thorough workup" on plaintiff, who complained of lower back pain and incontinence. *Id.* at 557–58. He concluded that she had chronic lower back pain that may have "a significant postural component." *Id.* at 558. He recommended a pelvic MRI and perhaps physical therapy. *Id.*

The next month, she was admitted to Marshall Medical Center after she fainted at home. *Id.* at 554. The treating physician recommended a "tilt table test," *id.* at 555–56, but neither party has directed the court to anything in the record showing the results of that test, if given.

On November 19, 2004, approximately a week after plaintiff filed her claim with defendant, Dr. Cyphers sent a letter to Dr. Sobelman stating that he had seen plaintiff "over the last three months" to treat her back pain, the symptoms of which had been increasing. *Id.* at 549. On the day of the letter, Dr. Cyphers had seen plaintiff and their discussion had "revealed some significant social issues and possible depression." *Id.* He informed Dr. Sobelman that he had referred plaintiff back to him for treatment and possible medication. *Id.*

On December 10, 2004, Dr. Cyphers saw plaintiff again "for review of back pain." *Id.* at 544. He noted that plaintiff had experienced some improvement from physical therapy, however she "still [felt] her back pain is significant enough that she would be unable to return to work and function adequately." *Id.* He stated that he discussed with plaintiff concerns she had raised about her job and encouraged her "to look for alternative employment

where she is not required to work at such a fast pace and be responsible for so many patients at one time." *Id.* Dr. Cyphers also observed that plaintiff "will also be unable to do significant lifting because of her back history and degenerative changes." *Id.* He concluded that his impression of her condition was that plaintiff had "chronic mechanical low back pain," improved "midthoracic pain," and "significant social issues related to disability." *Id.*

On January 6, 2005, plaintiff saw an unidentified doctor at Sierra Foothill Family Medical Associates for "[follow-up for] back pain." *Id.* at 521. The handwritten notes indicate that plaintiff was "feeling better on Wellbutrin, less stressed, [higher] energy this week." *Id.* She was assessed as having depression and situation anxiety. *Id.*

On February 14, 2005, Dr. Cyphers again saw plaintiff for her back pain. *Id.* at 490. He concluded that she had experienced some improvement in her pain and that "Wellbutrin has helped her overall outlook." *Id.* He noted that she had stayed off from work because her nursing duties were too physically demanding. *Id.*

On July 11, 2005, Smith faxed a letter to defendant in response to its request for records. *Id.* at 506–508. In sum, he described having treated plaintiff at two intervals—in 2001 and 2004–2005—for anxiety and depression related to her time working in Africa and diagnosed her as having an "adjustment disorder with depression and anxiety with . . . a Post-traumatic component." *Id.* He concluded, "the cumulative effect of these experiences . . . lead [him] to conclude that [plaintiff] is permanently disabled." *Id.* at 507.

That day, defendant's examiner completed a medical and vocational review of plaintiff's claim. *Id.* at 485. A review of

the plaintiff's medical records provided to date led the nurse reviewer to conclude,

> Claimant with low back pain but that does not appear to be the primary impairing condition. Claimant's impairment based on records is due to depression / anxiety / nightmares and flashbacks related to PTSD related to time spent nursing in Africa. Claimant's psychiatric condition precludes her from acute care nursing but would not appear to preclude other forms, such as office nursing, utilization review etc.

*Id.* at 485.[4]

Nonetheless, defendant approved plaintiff's claim on August 26, 2005, retroactive to May 12, 2005. *Id.* at 171–72. In the approval letter, defendant reiterated the portion of the policy relating to disability benefits for a disability caused or contributed to by a mental disorder. *Id.* It advised her that, based on the information provided in her claim application, her eligibility for benefits was limited by that provision and therefore her benefits would terminate in twenty-four months, in May 2007.[5] *Id.*

In September 2005, defendant asked to have plaintiff evaluated by a Vocational Consultant. *Id.* at 317. The consultant reviewed plaintiff's claim file and interviewed her by phone. *Id.* at 311. Based on the conversation, he concluded that it was unclear whether plaintiff was able to return to work due to her physical and psychological difficulties, but that her "well developed nursing skill sets, even at a sedentary level, would appear quite consis-

tent with a variety of related titles such as director of a nursing registry, advice nurse, quality assurance, utilization review, etc." *Id.* at 315–16.[6]

## C. Discontinuation of Plaintiff's Benefits

In March 2006, defendant notified plaintiff that her benefits would end in May of the next year. *Id.* at 75. The letter advised that this was because, per the terms of the policy, disability benefits would not be paid for more than twenty-four months for disability caused or contributed to by a mental disorder unless she was hospitalized at the end of the twenty-four month period and disability benefits would not extend past twenty-four months when the claimant was capable of performing her "regular occupation." *Id.* A "regular occupation," the letter explained, "is not your job with a specific employer, in a particular work environment, nor is it your specialty in a particular occupational field.... [W]e must evaluate your inability to perform your own regular occupation as it is performed in a typical work setting for any employer in the general economy." *Id.* at 76. The letter reviewed the medical documents it had received for plaintiff in light of the fact that nursing is considered "medium level" in terms of the amount of physical work it requires. *Id.* Relying on Smith's statements, it concluded that plaintiff had originally left work due to depression and anxiety. *Id.* Upon consideration of Smith and Cypher's records, defendant concluded that plaintiff "would be preclud-

---

4. It is difficult to give credence to this conclusion since various treating physicians found that the back pain was disabling and the depression, etc. was related to her disability. Indeed, the conclusion raises concerns whether defendant's conduct was arbitrary and capricious. The fact that a nurse, who had never seen plaintiff, was reviewing a treating doctor's records but reaching a different conclusion adds to the court's concern.

5. There is evidence in the record that plaintiff also had applied for Social Security benefits, which were granted beginning May 2005.

6. Under the policy, apparently there was no requirement that such jobs actually be available and thus no assessment of their availability was made.

ed from work in an acute care nursing setting, but not from duties such as office nursing, utilization review, etc." *Id.* Therefore, plaintiff could continue to perform "medium level" work, precluding her from receiving benefits past the twenty-four month mark. *Id.*

The letter also described the process to appeal the determination. *Id.* at 77. Among other provisions, the letter stated that an appeal must be filed within 180 days, from which time a response would be issued in forty-five days or, if there were "special circumstances," sixty days. *Id.*[7]

### D. Plaintiff's Appeal to Defendant

#### 1. First Appeal

On April 11, 2006, plaintiff "appealed" the determination, emphasizing that "[c]hronic back pain is my primary problem ... anxiety is secondary."[8] *Id.* at 132–33. Smith sent a letter in support of plaintiff's appeal. It stated that it was "inaccurate" to interpret his earlier letter as support of a finding that plaintiff could perform any nursing duties. *Id.* at 145. The letter explained in some detail Smith's diagnosis of plaintiff's mental health condition, concluding that she is "permanently ... unable to work" as a result. *Id.* at 146.

On April 18, 2006, defendant sent plaintiff a letter stating that it had reviewed her claim file again and determined that the decision to terminate long-term disability benefits should be reversed. *Id.* at 199. Her claim was referred back to the claims

department. *Id.* This was based on a determination that defendant had erred in concluding that plaintiff's condition did not preclude her from performing her occupational duties. *Id.* at 207–208.

Defendant next conducted a "Medical / Vocational Review" of plaintiff's claim file. *Id.* at 473. The review is asserted to be targeted at the question of whether plaintiff's primary disabling condition is mental rather than physical and if it is clinically supported to conclude that plaintiff's back pain restricted to "medium" the level of physical exertion of which she was capable. *Id.* Upon review, the examiner concluded that plaintiff's disability was psychological rather than physical. This decision was purportedly based on the medical information in her file, though it appears that it may be contrary to the bulk of information.

On August 14, 2006, defendant informed plaintiff that her benefits would terminate in May 2007 (twenty-four months from the date of the original claim), reiterating the limitations on benefits for impairments related to mental health conditions. *Id.* at 71–73. It again informed her of the appeal process. *Id.* at 73.

#### 2. Second Appeal

Plaintiff filed a letter of appeal of this decision. *Id.* at 129–30. In it, she stated that her "mental difficulties ... are resolved" and that her "primary disability" is back pain. *Id.* at 129.

---

7. Once again, the use of appeal suggests an independent body reviewing the file, while in truth, of course, all that plaintiff would get was a reconsideration by the insurance company as to whether it should continue to pay benefits, and thus reduce its profits.

8. Prior to filing the appeal, on March 23, 2006, plaintiff called defendant and spoke to an employee there, expressing her unhappiness with the decision. *Id.* at 156. The em-

ployee explained to plaintiff the "job vs. occupation" distinction for the award of benefits past twenty-four months. *Id.* Plaintiff expressed that she was unable to perform acute care or any work in the hospital. *Id.* According to the notes, plaintiff then "started to discuss nursing in Africa and her experiences and how that has impacted her ability to work. [Plaintiff] confirmed that her impairment is more psyche than physical." *Id.*

On September 12, 2006, plaintiff sent a letter in support of her appeal to defendant, stating that her "psych issues have resolved" and that she was no longer being treated by Brian Smith. She enclosed a letter from Dr. Cyphers, dated September 1, 2006, in which he explained that he had been treating plaintiff for two years for "orthopaedic concerns" and that she had developed chronic lower back pain. *Id.* at 399. He reiterated that as he had "previously stated in forms submitted . . . she is permanently disabled as a result of her back condition." *Id.* at 400.

Defendant then arranged for plaintiff to undergo a Functional Capacity Evaluation. *Id.* at 360. After conducting the tests, the examiner concluded that plaintiff had difficulty performing some tasks due to apparent low back pain, but was able to perform sedentary work. *Id.* at 360–85.

Defendant also had conducted a Residual Employability Analysis on January 5, 2007 based in part on a physical capacities questionnaire completed the month prior. *Id.* at 284. It concluded that based on her medical history and job history, she would be able to perform a number of specified medical positions that required only a sedentary exertion level. *Id.* at 285.

On January 8, 2007, defendant informed plaintiff that her appeal was denied, based in part on the results of the Functional Capacity Evaluation. *Id.* at 112.

### 3. Third Appeal

On April 24, 2007, plaintiff's attorney wrote to defendant and requested a review of the decision and asked for certain documents from her claim file. *Id.* at 106. On May 10, 2007, defendant sent plaintiff's attorney an acknowledgment of the request for review. *Id.* at 105.

On July 11, 2007, plaintiff's attorney again wrote defendant, reiterating the request for the claim file and stating that he had also received no response on the re-

quest for review of the denial of benefits. *Id.* at 52. On August 6, 2007, defendant sent plaintiff's counsel the claim file and stated that it was still in the process of reviewing the denial decision. *Id.* at 55. Due to its delay in providing the claim file to plaintiff, however, defendant would "leave the record open for a reasonable amount of time" to allow plaintiff to respond to any of the materials in the file. *Id.*

The denial review was performed for defendant by Dr. Ajendra Sohol, who reviewed the claim file and concluded that it supported the conclusion that plaintiff could perform sedentary work. *Id.* at 16–21.

Plaintiff's attorney filed her appeal on November 8, 2007, asserting that she was unable to perform sedentary work due to her back pain and that, even if she were, nursing is not a sedentary occupation. *Id.* at 31–45. On February 26, 2008, defendant notified plaintiff's attorney that termination of benefits was appropriate because she was not entitled to payments after twenty-four months unless she was unable to perform any occupation for which she was qualified and to the extent that her disability was contributed to by a mental health condition that did not require her to be hospitalized. *Id.* at 8–14.

### E. Complaint and Procedural History

Plaintiff filed her complaint on March 25, 2008. On August 29, 2008, plaintiff moved to remand in order for the plan administrator to consider her recent diagnosis of Huntington's Disease. After extensive briefing and a hearing on the motion, defendant stipulated to remand and to augmentation of the record with documents submitted by plaintiff regarding Huntington's Disease. Accordingly, an order was issued to this effect on October 6, 2008.

The supplemented administrative record consisted of a declaration of nurse practitioner Teresa Tempkin offered by plaintiff, a copy of her medical evaluation at UC Davis Medical Center's Department of Neurology after her diagnosis of Huntington's Disease, a copy of the Merck Manual of Diagnosis and Therapy describing Huntington's Disease, a copy of a book from the Huntington's Disease Society of America entitled "Understanding Behavior in Huntington's Disease," and, finally, a letter from defendant to plaintiff's counsel on December 30, 2008, confirming its prior decision to deny benefits after review of her claim file in light of the new diagnosis.

In supplement of the record, plaintiff has submitted the apparent medical record from her visit to the UC Davis Medical Center Department of Neurology on July 11, 2008. Supplemental Administrative Record ("SAR") at 15. According to the document, plaintiff's reason for her visit was loss of balance and, at that time, she was diagnosed with Huntington's Disease. *Id.* In the review of plaintiff's medical history, the treating physician noted that plaintiff reported that beginning in late–2003, she began "experiencing cognitive disturbances such as short-term memory loss, decreased attention, and period of confusion ... [which] [e]ventually ... forced [her] to early retirement from her nursing position." *Id.* at 16. There is no indication of a review of her medical file. *See id.* at 15–24. The report notes that plaintiff reported that her other medical providers had found no reason for her cognitive problems, including through MRI testing, and that she had been previously treated for back problems, as well as other medical problems. *Id.* at 16. The report did not relate her previous cognitive problems to Huntington's Disease.

As noted, plaintiff also supplemented the record with the declaration of Nurse Practitioner Teresa Tempkin. *Id.* at 12–14; *see also* Decl. of David Allen In Support of Pl.'s Opp. to Def.'s Mot. for Judgment ("Allen Opp. Decl.") ¶ 3 (describing that he was referred to Tempkin as being the nurse practitioner assigned to plaintiff). In her declaration, Tempkin confirmed that plaintiff was diagnosed with Huntington's Disease on July 11, 2008. SAR at 11. It described the disease as manifesting a "loss of intellectual faculties, ... emotional disturbance ... [and] depression." *Id.* at 12; *see also id.* at 26–27 (Merck Manual describing similar symptoms), 35–43 ("Understanding Behavior in Huntington's Disease," describing same). According to Tempkin, plaintiff was diagnosed with having Stage 1 Huntington's Disease, characterized by "marginal, or no, engagement in occupation, ... or the person may maintain a lower level of employment with assistance in one of the other basic functions." *Id.* at 13. This may manifest with difficulty performing multi-step tasks, shift attention between tasks, and monitor one's time management. *Id.* at 13–14. The physical, cognitive, and psychiatric symptoms of the disease, however, vary among people. *Id.* Tempkin's declaration did not contain any review of plaintiff's prior medical history. *See id.* at 12–14.

Finally, the record includes the December 30, 2008 letter from defendant to plaintiff's attorney, confirming the denial of her benefits past twenty-four months. *Id.* at 4–10. It contains an excerpt of a review of plaintiff's file by neurologist Dr. Craig Bogan in light of her diagnosis with Huntington's Disease. *Id.* at 6–8. Based on a review of her records, he confirmed that they supported the conclusion that in May 2007, plaintiff was capable of performing sedentary work. *Id.* at 7.

He also concluded, "Concerning the patient's more recent diagnosis of Huntington's Disease, it cannot be determined from the available records if she was hav-

ing any clinical signs or symptoms of this disorder in 5/07." *Id.* He asserted that although Huntington's Disease is a genetic disorder, the age at which a person will first experience symptoms, the rate at which the symptoms progress, and the severity of the disorder vary among people. *Id.* He noted that, "Fluctuating depression, speech difficulty, and cognitive problems that [plaintiff] had between 2003 and 2005, all of which subsequently improved, would be atypical for Huntington's Disease. Once symptoms of this illness developed, they generally progressively worsen." *Id.* at 8. Finally, he observed that her symptoms at the time of her diagnosis in 2008 "were fairly subtle" and there was no indication that she had similar cognitive impairment in May 2007. *Id.*

As with all past reviews, defendant concluded that plaintiff had not demonstrated that she was incapable of performing the duties of "any occupation" for which she was qualified and, moreover, there was no evidence that she was experiencing the symptoms of Huntington's Disease in May 2007. *Id.* at 8–9.

Upon plaintiff's counsel's multiple requests in January 2009, *id.* at 3, defendant forwarded to plaintiff a letter from Dr. Bogan identifying the contents of plaintiff's claim file that he relied on in reaching his opinion. *Id.* at 1–2. This appears to have been sent approximately three weeks after plaintiff counsel's first request. *See id.* at 1–3.

## II. STANDARD

A district court reviews decisions of the insurer in ERISA cases based on the record before it, essentially conducting a trial on the record. *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1094–95 (9th Cir.1999). The court then must make findings of fact and enter judgment pursuant to Federal Rule of Civil Procedure 52. *Id.* at 1095. The standard of the district court's review

of the decision is discussed more fully, *infra.*

## III. ANALYSIS

The parties' dispute centers around two issues: what standard of review the court should employ in evaluating the defendant's decision to deny plaintiff's claim after twenty-four months and whether its decision was correct in light of the facts and its legal obligations to plaintiff. The court considers each of these questions in turn.

### A. Standard of Review

■ The standard of review employed by district courts depends first on whether the ERISA plan at issue conferred discretion on the plan administrator to determine a participant's eligibility for benefits or to interpret the terms of the plan. *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 963 (9th Cir.2006) (*en banc*) (citing *Firestone Tire & Rubber v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). If there is no such discretion in the plan, the administrative decision is reviewed de novo. *Id.* If discretion has been conferred, the administrator's decision is reviewed for abuse of discretion. *Abatie,* 458 F.3d at 963; *Snow v. Standard Ins. Co.,* 87 F.3d 327, 332 (9th Cir.1996) *overruled on other grounds by Kearney v. Standard Ins. Co.,* 175 F.3d 1084 (9th Cir.1999).

■ Even where the plan is not explicit in its grant of discretion, the court will find that the administrator' decision is discretionary so long as it "include even one important discretionary element, and the power to apply that element is unambiguously retained by its administrator." *Bogue v. Ampex Corp.,* 976 F.2d 1319, 1325 (9th Cir.1992); *see also Snow,* 87 F.3d at 330 (collecting cases and recognizing that "[w]e have not been stingy in our determinations that discretion *is* conferred upon plan administrators").[9]

---

9. Whether stingy or not, because it is in the

plan's interest to limit the scope of review, it

Here, the language of the plan explicitly confers discretion to the plan administrator. The plan provides:

The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all parties. [Reliance Standard Life Insurance Company] shall serve as the claims review fiduciary with respect to the insurance policy and the Plan.

IRC at 251.

■ The inquiry, however, is said not to end there. Even if the ERISA plan grants discretion to the administrator, the court must employ a "more searching" standard of review when the court has a reason to believe that the administrator did not act in accordance with his fiduciary responsibilities. *Id.* at 331; *Abatie,* 458 F.3d at 967–68. This exception often arises where there is evidence of the administrator's conflict of interest in determining eligibility. *See Abatie,* 458 F.3d at 966–68. This also arises where the administrator violates the procedures mandated by ERISA in a way that is "so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm." *Gatti v. Reliance Standard Life Ins. Co.,* 415 F.3d 978, 985 (9th Cir.2005).

In *Abatie,* the Ninth Circuit explained the approach the district court should take when confronted with circumstances that call into question whether the plan administrator violated his fiduciary duty to the claimant. It began with the understanding that *Firestone* requires that the court employ an abuse of discretion standard when an ERISA plan vests the administrator with discretion, but "a review informed

by the nature, extent, and effect on the decision-making process of any kind of conflicts of interest that appear on the record." 458 F.3d at 967. When, for example, the administrator had an apparent conflict of interest but there is no other evidence of "malice, self-dealing, or of a parsimonious claims-granting history," then the court should approach the administrator's decision with minimal "skepticism." *Id.* at 968. However, when an administrator engages in "wholesale and flagrant violations" of the procedural requirements of ERISA, the court should review the administrator's decision de novo. *Id.* at 971. The court approved of its prior cases, including *Gatti,* holding that less severe violations of procedural regulations trigger an abuse of discretion review. *Id.* at 972. "When an administrator can show that it has engaged in ongoing, good-faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity." *Id.* (internal citations omitted).

*Abatie*'s holding, however, with regards to the use of a de novo standard of review when the administrator has acted contrary to its fiduciary duty appears to have been abrogated by the Supreme Court last year in *Metropolitan Life Insurance Company v. Glenn,* —— U.S. ——, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). There, the Court held that when an insurer acts as the plan administrator, this creates a conflict of interest. *Id.* at 2348–50. That conflict, however, does not "impl[y] a change in the *standard* of review, say, from deferential to de novo review." *Id.* at 2350 (emphasis in original). Instead, the administrator's conflict of interest should be considered as a factor when considering whether it abused its discretion in denying the claim. *Id.* at 2351.[10]

is the court's experience that the plan inevitably confers discretion on the administrator.

10. What other factors might bear upon abuse has not been articulated. It appears to this

Here, plaintiff urges the court to find that several acts of the administrator demonstrate an abandonment of its fiduciary responsibilities, so as to warrant de novo review. These are its failure to adhere to its own deadlines and ERISA regulations in rendering the appeal, its having "continuously worked to deny benefits," failure to adequately weigh the opinions of plaintiff's treating physicians, and failure to provide plaintiff with a copy of Dr. Bogan's report in conjunction with defendant's final denial of plaintiff's claim. Pl.'s Mot. for Judgment at 15. The court discusses each in turn.[11]

**1. Defendant's Failure to Adhere to Its Own Procedures In Resolving Plaintiff's Appeals**

Plaintiff urges the court to hold that defendant's failure to adhere to its own stated procedures and deadlines demonstrates a breach of its fiduciary duty such that de novo review should be employed. She relies on *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir.2008). *Saffon*, however, cannot support so broad an argument. Indeed, that court did not address procedural irregularities—such as delayed decisionmaking—but the administrator's failure to provide the claimant with specific additional information it needed to evaluate her claim, which it was required to do under Circuit precedent interpreting the ERISA regulations. *Id.* at 870–72. Plaintiff has directed the court to no authority, nor is the court aware of any, that the administrator's failure to adhere strictly to its own procedures evinces a breach of its fiduciary duty.

The case *Jebian v. Hewlett–Packard Co. Employee Benefits Org. Income Prot.*

*Plan*, 349 F.3d 1098 (9th Cir.2003), is instructive on this issue, however. There, the defendant had denied long-term disability benefits to the plaintiff, who then appealed the decision. *Id.* at 1102. The plan contained a provision that an appeal would be "deemed denied" if the administrator did not resolve it within sixty days nor inform the claimant within that period of the need for an extension of another sixty days. *Id.* After plaintiff filed his appeal, defendant did not respond with a denial decision for approximately four months. *Id.* at 1103.

The court held that this warranted the use of de novo review of the denial. *Id.* It reasoned that the plan vested the administrator with discretion, but also set forth the limits of the discretion by providing deadlines for certain actions. *Id.* at 1104. In other words, a plan administrator who acts outside the scope of its discretionary authority is not entitled to deferential review. *Id.* Moreover, the court reasoned, by deeming the claimant's appeal denied for the purposes of permitting the claimant to file suit and then subsequently rendering an adverse appeal decision, the administrator has effectively "sandbagged" the claimant. *Id.* The court observed that in prior cases, it had held that a administrator's failure to adhere to its own procedures bears on the application of the abuse of discretion standard. *Id.* at 1105 (citing *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir.1984)). In light of this, the court reasoned, holding that procedural irregularities could alter the standard of review was not unwarranted, particularly in light of the *Firestone* Court's rule regarding the degree of deference given to ERISA plan administrators' decisions.

court that determinations based upon the medical record, but with a result contrary to the examining physician's conclusion, may well be another such factor.

11. The court does so with some distaste. Applying legal standards to what is clearly a stacked deck brings discredit to the legal process.

Even if *Jebian* remains good law after *Metropolitan Life, supra*, there are facts that make the instant case distinguishable. First, the deadlines of the appeal decision in the instant case were not included in the policy, in which defendant's discretionary authority was set forth. *See* ICR at 251. The policy created no temporal limits to the exercise of defendant's discretion. *See id.* The *Jebian* court relied strongly on the fact that "[t]he instrument in this case does vest discretion, but same instrument . . . set time boundaries within which that discretion must be exercised." *Jebian*, 349 F.3d at 1103; *see also Firestone*, 489 U.S. at 111, 109 S.Ct. 948 (scope of administrator's discretion defined by the instrument granting the discretion). Here, there was no such limit built into defendant's discretionary authority.

Moreover, in defendant's denial letter to plaintiff, it did not state that her appeal would be "deemed denied" if there was no response within a certain time frame. Instead, the letter can be read to be informative as to the period of time the defendant typically intended to provide a response to plaintiff. *See* ICR at 113 ("Under normal circumstances, you will be notified . . . of the final determination in 45 days . . . . If we determine that special circumstances require an extension of time for processing, you will ordinarily be notified of the decision no later than 90 days from the date we receive your request for review.") This contrasts with *Jebian*, where it had not only limited itself to the time periods set forth in the plan, but provided that the appeal was deemed denied if no decision was rendered during that time. Similar provisions did not exist in defendant's plan or appeals letter.

The court cannot conclude that *Jebian* requires it to employ a de novo review standard on the basis that defendant's untimely denial of the appeal. Nevertheless, the untimeliness should bear on the court's review of the decision.

## 2. Defendant's Failure to Adhere to the Deadlines in the ERISA Regulations In Resolving Plaintiff's Appeals

Plaintiff urges the court to hold that the defendant taking 110 days to respond to her November 2007 appeal violated ERISA so flagrantly as to result in the use of a de novo standard of review of the administrator's decision. ERISA regulations require that employee benefit plans "establish and maintain reasonable procedures governing . . . appeal of adverse benefit determinations." 29 C.F.R. § 2560.503–1(b). In cases where the claimant appeals the administrator's decision regarding a disability claim, as is the case here, the administrator must render a decision within forty-five days of the receipt of the appeal. *Id.* § 2560.503–1(f), (i)(3)(i). This period may be extended by up to sixty days if necessary for reasons beyond the administrator's control and if notice is given to the claimant. *Id.* Accordingly, because plaintiff submitted her appeal on November 8, 2007 and there was apparently no extension sought by the administrator, the administrator's deadline to respond was December 23, 2007.

The dispositive question is whether and to what extent this failure to adhere to the ERISA regulations affects the deference the court gives to the administrator's decision. This question appears not to have been squarely addressed by the Ninth Circuit since the revision of ERISA regulations in 2002. Prior to 2002, the regulations provided that, if the administrator failed to adhere to the time limitations for responding to claims, the claim was deemed denied. *See* 29 C.F.R. § 2560.503–1(f)(3)(2002). This language was altered so that, after January 1, 2002,

if the administrator fails "to ... follow claims procedures consistent [with the regulations], a claimant shall be deemed to have exhausted administrative remedies" for the purpose of bringing suit. *Id.* § 2560.503–1(*l* ).

The Ninth Circuit has held that, under the pre–2002 regulations, failure to adhere to the deadlines set forth in the regulations will not alone warrant the use of a de novo standard of review.[12] *Gatti*, 415 F.3d at 978. Instead, the "deemed denied" language of the earlier regulations simply provided beneficiaries with a final decision, permitting them to file suit.[13] *Id.* at 983. The court reasoned that this interpretation was similar to that used in other statutory contexts and by at least one Justice of the Supreme Court. *Id.* at 983 & n. 3 (citing *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1178 (9th Cir.2002) and *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 144, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (Stevens, J., concurring)).

Although the *Gatti* court was interpreting the pre–2002 regulations, it considered in dicta the effect 2002 amendments as well. It concluded that the amendments confirmed the court's understanding that the "deeded denied" language only operated to allow the claimant to file suit and did not alone affect the standard of review.[14] *Id.* at 983. The change of the language from "deemed denied" to "deemed to have exhausted administrative remedies" sug-

gested that an administrator's failure to adhere to regulatory deadlines was intended to only affect the claimant's ability to bring suit. *Id.* The court concluded that "[n]othing in the history of ERISA or its regulations, nor in the precedent that binds us, indicates that the 'deemed denied' language is a temporal restriction on the administrator's discretion." *Id.* at 984.

Since the 2002 amendment, other courts have held that the administrator's failure to adhere to the regulations' deadlines does not alone merit the use of a de novo standard of review. *See Peterson v. Federal Exp. Corp. Long Term Disability Plan*, No. 05–1622, 2006 WL 1495307, at *6–*7 (D.Ariz. May 24, 2006) (concluding that the *Gatti* rule most likely applies to the 2002 amendments and therefore that the plan administrator's failure to timely render a decision did not trigger de novo review); *Neathery v. Chevron Texaco Corp. Group Acc. Policy No. OK 826458*, No. 05–cv–1883, 2006 WL 4690902, at *8 (C.D.Cal. Jul. 31, 2006) (same); *Riffey v. Hewlett–Packard Co. Disability Plan*, No. 05–1331, 2007 WL 946200, at *12–*14 (E.D.Cal. Mar. 27, 2007) (Damrell, J., holding that administrator's failure to timely reply to claimant's appeal was not a serious enough violation to warrant de novo review, relying on *Gatti* ).

Instead, those courts have said that the administrator must show a flagrant disre-

---

**12.** Although *Gatti* was decided in 2005, it considered a claim filed prior to the enactment of the new regulations and thus was analyzed under the pre–2002 amendments. 415 F.3d at 978 n. 1.

**13.** The court distinguished *Jebian*, 349 F.3d 1098, which had held that where the plan itself had set forth deadlines for the administrator to act, failure to adhere to these deadlines would cause a court to employ de novo review, unless there was evidence of good faith attempt to comply with the procedures. *Gatti*, 415 F.3d at 982. ("The *Jebian* decision

recognizes that there will be cases where benefits decisions are made in violation of the regulations alone, and explicitly leaves this issue open.").

**14.** Moreover, as discussed above, *Metropolitan Life* appears to disapprove of use of a de novo standard of review based solely on the administrator's failure to adhere strictly to his fiduciary duty; instead, it indicates that this should be considered when weighing whether the administrator abused its discretion. *Metropolitan Life*, 128 S.Ct. at 2350.

gard for the procedures of ERISA in a way that substantially injured the claimant. *Gatti*, 415 F.3d at 985; *see also Abatie*, 458 F.3d at 971 ("[I]f the plan administrator's procedural defalcations are flagrant, de novo review applies."). This comports with this circuit's apparent strict approach to allegations that the administrator operated with a conflict of interest. In those cases, an apparent conflict is not enough to justify the court using a de novo standard of review. Rather, the claimant must show with "material, probing evidence" that the administrator's "self-interest caused a breach of [his] fiduciary responsibilities to the beneficiary." *Abatie*, 458 F.3d at 963.[15]

Here, under these cases, the administrator's inaction appears not severe enough to warrant the use of the de novo standard of review by itself. According to the plaintiff's evidence, the administrator was approximately two months late in responding to plaintiff's appeal, per the ERISA regulations. Based on the two-month delay alone, the court cannot conclude that the administrator acted in a way that was "so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm," *Gatti*, 415 F.3d at 985, even if that remains a proper approach under *Metropolitan Life*.

### 3. Defendant Having "Continuously Worked to Deny Benefits" to Plaintiff

Plaintiff next asserts that defendant "continuously worked to deny benefits" to her, directing the court to evidence of virtually every action the defendant has taken in the course of reviewing her claim and denying her appeals. Of course, continued denial may prove no more than that plaintiff's case is unworthy of benefits. It cannot by itself demonstrate a justification for de novo review.

### 4. Defendant's Asserted Failure to Adequately Weigh Plaintiff's Physicians' Opinions

Next, plaintiff contends that a de novo standard of review must be employed due to defendant's failure to give adequate weight to her treating physicians' opinions, relying on the *Saffon* court's reference to Social Security cases' relevance in resolving cases under ERISA. *Saffon*, 522 F.3d at 872–73. In citing the passage from *Saffon*, however, plaintiff omits the footnote within it, which states

> While the rules and presumptions of our Social Security case law do not apply to ERISA benefits determinations, *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 ... (2003), our Social Security precedents are relevant for the factual observation that disabling pain cannot always be measured objectively-which is as true for ERISA beneficiaries as it is for Social Security claimants.

*Id.* at 873 n. 3. In *Nord*, the Court held that the presumption in Social Security cases that treating physicians' opinions must be given deference does not apply in the ERISA context. Nonetheless, it seems to this court not to be irrelevant when the insurer reviews the record made by the plaintiff's doctors but comes to a contrary opinion.

### 5. Defendant's Failure to Provide Plaintiff a Copy of the Reviewing Physician's Report After Her Final Appeal Denial

Finally, plaintiff urges the court to utilize a de novo standard of review due to

---

**15.** One cannot help but wonder whether any facts suffice to end the bias in favor of the plan. The fact is that in every case before a court two things are true: there is a conflict and plaintiff was denied benefits.

defendant's failure to provide her with a copy of Dr. Bogan's report, which was relied on and cited in defendant's final denial of plaintiff's claim appeal. Plaintiff asserts that, "Since Reliance relied almost exclusively on the report of Dr. Bogan to again deny the claim, the specific wording of his report and the documents he reviewed are pivotal." Pl.'s Mot. for J. at 16. Plaintiff relies on *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir.1997) and *Saffon*. Neither *Booton* or *Saffon* provide direct support for plaintiff's position, although both recognize the need for meaningful communication.

Additionally, the defendant asserts in its opposition to plaintiff's motion that Dr. Bogan's report has been provided to plaintiff. Def.'s Opp'n to Pl.'s Mot. for J. at 8. There is no indication in the supplemental record for that nor has defendant tendered any additional evidence of that. It is important, nonetheless, to recognize that in *Metropolitan Life*, 128 S.Ct. at 2348; *Firestone*, 489 U.S. at 115, 109 S.Ct. 948, the high court mandated deference. That standard may only be abandoned in favor of a de novo review standard "[w]hen an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well." *Abatie*, 458 F.3d at 971.

Plaintiff has asserted several grounds for use of de novo review instead of an abuse of discretion standard, none of which alone suffices to justify use of that standard. The court is of the view that if it was writing on a clean slate, de novo review might well be justified. Taken cumulatively, however, the court cannot find "wholesale and flagrant violations" of ERISA's requirements so as to indicate an "utter disregard" of the plan's purpose to provide benefits to its beneficiary. *See Abatie*, 458 F.3d at 971.

The failings by defendant are not insignificant, particularly given plaintiff's compelling personal interest in pursuing her claim and having defendant act fairly and openly with her in the course of its decision-making and when explaining the basis of its denial. *See Booton*, 110 F.3d at 1463; *Saffon*, 522 F.3d at 870. The administrator is a fiduciary to the beneficiary and, as such, owes a "special duty of loyalty" to her. *Metropolitan Life*, 128 S.Ct. at 2347. Nevertheless, the court is bound by precedent that has made clear that only extreme, flagrant instances of departure from its fiduciary role will an administrator's decision be reviewed de novo. *Abatie*, 458 F.3d at 971. The various omissions or neglect by defendant do not rise to that level. The court therefore is bound to apply an abuse of discretion standard to defendant's determination.

**B. Whether Defendant Abused Its Discretion**

Relying on trust law, as the *Firestone* Court did, the Court of Appeals has held that an administrator abuses its discretion when its denial of benefits was "unreasonable." *Clark v. Wash. Teamsters Welfare Trust*, 8 F.3d 1429, 1432 (9th Cir.1993); *MacDonald v. Pan Am. World Airways, Inc.*, 859 F.2d 742, 744 (9th Cir. 1988); *see also Firestone*, 489 U.S. at 111, 109 S.Ct. 948. When the plan administrator is also the entity that funds the benefits, a conflict of interest exists, which the court should consider as a factor when determining whether the administrator abused its discretion in denying benefits. *Metropolitan Life*, 128 S.Ct. at 2348–50. Where, the administrator is not the beneficiary's employer but the insurer (as here), it is said that "the conflict question is less clear." *Id.* at 2349. An insurer is said to have less of an incentive to deny claims than would an employer, but the cost-saving interests of the employer may in-

fect an insurance company by encouraging it to keep its rates low by denying claims. *Id.* at 2349–50. Nonetheless, collecting premiums and not paying benefits directly effects the insurance company's bottom line. Given the restrictions on review, the plan administrator's fiduciary duty to "provide a full and fair review of claim denials." *Id.* at 2350 (citing *Firestone*, 489 U.S. at 113, 109 S.Ct. 948), appears no more than verbiage.

Here, as in *Metropolitan Life*, "[t] he record says little about [defendant's] efforts to ensure accurate claims assessment," which could include, for example, "walling off claims administrators from those interested in firm finances, or … imposing management checks that penalize inaccurate decisionmaking." *Id.* at 2351.

In the instant case there were some procedural problems that also call into question the fidelity of defendant to plaintiff in evaluating her claim. As identified above, the appeal decision in February 2008 was rendered approximately twenty days after the deadline defendant had described in its earlier letter to plaintiff. *See* AR at 8–15, 113. Although defendant offered to provide plaintiff her claim file or other documents on request, plaintiff's counsel made this request several times over the course of a few months, waiting 104 days to receive it. *See id.* at 52, 55, 106, 112–13. Finally, as discussed above, defendant did not provide to plaintiff the complete report from Dr. Bogan, on which defendant relied in denying her final appeal. *See* SAR at 1–10.

While these are not unimportant defects in the defendant's procedures, defendant did take some steps to mitigate their effect on plaintiff. As described above, although Dr. Bogan's full report was not provided to plaintiff, a two-page excerpt of it was included in the final claim denial letter and Dr. Bogan, through defendant, later provided plaintiff a description of the docu-

ments in her claim file on which he had relied. *Id.* While hardly meeting a desired level of transparency and candor, nevertheless, defendant's conduct does not rise to the level of a flagrant disregard under the cases.

The same can be said of defendant's delay in providing a copy of plaintiff's claim file to her upon request. While the appeal decision did not state a deadline by which it would provide a claims file or other documents upon request *See id.* AR at 112–13. It is reasonable to expect that defendant would provide requested documents with reasonable promptness and a 104–day delay as excessive. Nonetheless, thereafter defendant then took measures to mitigate the effect of this delay by keeping plaintiff's claim file open to permit her to respond to the elements of the file. *See id.* at 55.

Finally, the twenty day delay in rendering a final decision cannot demonstrate that the administrator abused its discretion. Nonetheless, it is important, in the court's estimation, to view this delay in the context of defendant's entire course of conduct with the plaintiff. It notified her of the planned termination of her benefits more than a year in advance. AR at 75. Her first appeal was filed in April 2007 and resolved tentatively in her favor a week later, but then the denial was confirmed four months later after a Vocational Review was performed. *Id.* at 71–73, 473. This process was completed more than six months before her benefits were due to terminate. *See id.*

She appealed this decision almost immediately and defendant requested plaintiff undergo another evaluation to determine her physical capacity. *Id.* at 129–30, 360. Approximately four and a half months later, it denied her appeal again. *Id.* at 112. This occurred approximately two months before her benefits were due to terminate.

She appealed again in April 2007 through her attorney, a month after her benefits terminated. *Id.* at 106. This is the decision that was rendered in 110 days, approximately twenty days after defendant's ninety-day, self-imposed deadline. *Id.* at 8–14.

The review of this history yields two competing observations. First, the twenty-day delay in resolving her third appeal was not unusual per defendant's prior course of conduct and, in fact, was more timely than defendant's prior determinations. On the other hand, during each of the periods between the time when plaintiff sent her appeal letters and the decisions were rendered, defendant appears to have been in contact with plaintiff, at least to request and obtain various evaluations. Moreover, by notifying plaintiff more than a year in advance of her impending termination of benefits and allowing the appeals process to commence then, defendant considered and rendered decisions on two rounds of appeals prior to the benefits' termination. It appears that defendant's delays do not compel the court to take a more skeptical view of the claim denial, even taking the conflict of interest into account. *See Abatie,* 458 F.3d at 968–69; *Saffon,* 522 F.3d at 871–72.

 Finally, the court must consider the factual justification for the denial of plaintiff's claim. A court should look skeptically on denials that are offered for different reasons over time or that rely on selective evidence from the claim file or that are based on an incomplete set of facts, where the administrator has not sought out additional information. *Abatie,* 458 F.3d at 974; *Saffon,* 522 F.3d at 873; *Booton,* 110 F.3d at 1463. An administrator also abuses its discretion if its interpretation of the plan is unreasonable. *MacDonald,* 859 F.2d at 744.

Here, no such flaws are apparent. The defendant's denial notices to plaintiff were written in clear language and described, often in detail, the facts on which defendant had relied in denying her claim and their relationship to the relevant provisions of her policy. *See* ICR at 8–14, 71–73, 75–77, 112–14; SAR at 8–10. Defendant appears to have interpreted the relevant provisions of the policy—concerning long-term disability benefits eligibility for disabilities contributed to by "mental disorders" and the "any occupation" limitation—per their plain language. *See* ICR at 247; *see also McKenzie v. Gen. Tel. Co. of Cal.,* 41 F.3d 1310, 1317 (9th Cir.1994) ("the language of the 'any occupation' standard is not searching"), *overruled on other grounds by Saffon,* 522 F.3d at 872 n. 2.

The denials were also based on an apparently complete review of the record, as well as additional information and evaluations the defendant sought at each denial. *See, e.g.,* ICR 77–78, 112, 315–16, 360, 473, 485. This distinguishes the case from *Saffon,* where the court held that the administrator improperly relied on certain pieces of evidence and not others and failed to seek out additional information it needed to make its decision. *See Saffon,* 522 F.3d at 870–72.

Finally, its determination was not unreasonable. In brief, plaintiff's initial claim was based on back pain and anxiety and depression, although the latter was characterized as secondary. ICR at 273, 503–504. Despite this characterization, there was consistent evidence throughout her file that her emotional stress was an element in her asserted disability. *See id.* at 146, 156, 275, 507, 521, 549, 585. Based on this, it was not unreasonable for defendant to conclude that, to the extent that her disability was contributed to by a mental state of anxiety or depression, it was not covered beyond twenty-four months (unless plaintiff was hospitalized at the time, which she has not asserted nor does the

record indicate was the case). *See id.* at 257.[16]

Finally, the court notes that defendant's determination based on the additional evidence relating to Huntington's Disease was not unreasonable. Plaintiff supplemented the record with evidence of her diagnosis at Stage 1 of Huntington's Disease, as well as general information about the disease, including the symptoms at that stage. SAR at 12–90. Nonetheless, the diagnosis itself does not refer to plaintiff's emotional stress in the years prior, but rather "cognitive disturbances," SAR at 16, which appear never to have been evidenced in any earlier medical document that is part of the record.

Moreover, Teresa Tempkin's declaration described only in generalities the possible symptoms a person with plaintiff's diagnosis might experience, including diminished ability to work, although she did not describe plaintiff's own symptoms or their effect on her ability to work. *Id.* at 13–14. Plaintiff tendered no evidence of any medical professional's review of her medical file or other evidence that would link her earlier symptoms that formed the basis of her claim to her recent diagnosis. Defendant, however, did have such an evaluation performed by Dr. Bogan, who concluded that her past symptoms and their variability were atypical as symptoms of Huntington's Disease and that there was no evidence that she had experienced other symptoms of Huntington's Disease in May 2007. *Id.* at 8. Based on all of this evidence, the court cannot conclude that defendant's denial of plaintiff's appeal in December 2008 was unreasonable. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 880 (9th Cir.2004) ("That a person has a true medical diagnosis does not by itself establish disability."),

*overruled on other grounds by Abatie,* 458 F.3d at 969.

## IV. CONCLUSION

For the reasons stated herein, plaintiff's motion for judgment is DENIED and defendant's motion for judgment is GRANTED. Judgment is entered in defendant's favor.

The Clerk is directed to close the case.

IT IS SO ORDERED.

---

**16.** Again it is not clear to the court the emotional distress caused by the physical disabili-

ty is not covered.